PEOPLE v REED

Docket No. 96936. Argued November 1, 1994 (Calendar No. 9). Decided July 25, 1995.

Albert Reed was convicted by a jury in the Detroit Recorder's Court, Edward M. Thomas, J., of first-degree murder, attempted armed robbery, and possession of a firearm during the commission of a felony. The Court of Appeals, BRENNAN, P.J., and ALLEN and GRIBBS, JJ., affirmed in an unpublished opinion per curiam (Docket No. 74583). Thereafter, the defendant sought postappeal review under MCR 6.508(D), and the Detroit Recorder's Court, Daphne Means Curtis, J., granted relief, finding that the defendant's trial and appellate counsel were ineffective. The Court of Appeals, GRIFFIN, P.J., and FITZGERALD, J. (SHEPHERD, J., concurring in part and dissenting in part), reversed, holding that the court had erred in finding that the defendant had shown good cause under MCR 6.508(D)(3)(a) on the basis of the failure of his appellate counsel to raise certain issues in the first appeal (Docket No. 150502). The defendant appeals.

In separate opinions the Supreme Court affirmed the decision of the Court of Appeals, and *held:*

Effective assistance of appellate counsel does not require counsel to raise every arguably meritorious issue on appeal.

Justice BOYLE, joined by Chief Justice BRICKLEY and Justice RILEY, stated that cause for excusing procedural default is established by proving ineffective assistance of appellate counsel, pursuant to the standard set forth in *Strickland v Washington,* 466 US 668 (1984), or by showing that some external factor prevented counsel from previously raising an issue. MCR 6.508 protects unremedied manifest injustice, preserves professional independence, conserves scarce judicial resources, and enhances the finality of judgments. In this case, there was no ineffective assistance of counsel at either the trial or appellate levels, and the defendant failed to demonstrate cause as required by MCR 6.508(D)(3).

The specific purpose for creating the postconviction procedures was to provide finality of judgments affirmed after one full and fair appeal and to end repetitious motions for new trials. Requiring appellate lawyers to function at a level of objectively reasonable performance encourages lawyers to ac-

cept assignments and to diligently serve their clients, and promotes the goal of finality in judgments. Where the state has afforded a full and fair opportunity to reliably determine guilt and an appeal of right, assisted by constitutionally adequate counsel at public expense, all institutional and public interests support the conclusion that proceedings should come to an end unless the defendant's conviction constituted a miscarriage of justice. Attorney error short of ineffective assistance of counsel does not constitute cause for a procedural default, even when that default occurs on appeal rather than at trial.

Defining ineffective assistance of appellate counsel as the failure to raise any arguable claim would impair the independence of the profession. The ultimate effect would profoundly destabilize the finality of judgments and exponentially increase the burdens on appellate counsel, the Court of Appeals, and trial courts presiding in collateral matters. Such an approach is neither commanded by the constitution nor justified by sound public policy.

Justice CAVANAGH, joined by Justice MALLETT, concurring in part and dissenting in part, stated that while the right to effective assistance of appellate counsel does not necessarily require that appellate counsel advance every conceivable issue on appeal, federal habeas corpus jurisprudence should play only a limited role in defining the standards imposed by MCR 6.508. MCR 6.508 is intended to force a defendant to bring all appellate claims in an appeal of right to promote the finality of judgments, and is not concerned with the concepts of habeas corpus jurisprudence, i.e., comity or federalism.

A defendant must show both good cause and prejudice to substantiate a claim of ineffective assistance of counsel. If, as in this case, there is no actual prejudice, there is no need to determine whether good cause has been shown. In light of the overwhelming evidence of the defendant's guilt, the errors asserted would not have altered the verdict of guilty.

Justice LEVIN concurred in part I of Justice CAVANAGH's opinion.

Affirmed.

Justice LEVIN, dissenting, stated that the defendant showed good cause for failing to raise issues on the first appeal. The ineffectiveness of the first appellate lawyer is not an issue that will be raised by him on direct appeal. Because the Court of Appeals did not consider the allegations or findings of prosecutorial misconduct and trial lawyer ineffectiveness, and did not consider whether Reed showed actual prejudice, those issue need not be addressed. The Supreme Court should not bypass

the trial court and Court of Appeals by resolving issues not addressed by those courts. Because the judge's findings postappeal regarding the issue of the actual prejudice are inadequate, remand to the trial court for further consideration should be required.

The goal of promoting the finality of judgments is not served by encouraging appellate lawyers in criminal cases to outguess appellate benches by deciding which will be the winning issues that should be brought to the appellate court's attention, and ignoring other meritorious issues.

Finality of judgments will best be promoted by holding appellate lawyers, whether retained or appointed, to standard 9 of the Minimum Standards for Indigent Criminal Appellate Defense Services, adopted by the Supreme Court in Administrative Order ·No. 1981-7, pursuant to MCL 780.712; MSA 28.1114(102), which provides that counsel should assert claims of error that are supported by facts of record, that will benefit the defendant if successful, that possess arguable legal merit, and that should be recognizable by a practitioner familiar with criminal law and procedure who engages in· diligent legal research. Often what an appellate lawyer thought would be the best issue will be ignored by the appellate court. Reversal may be granted on what the lawyer thought was a losing issue.

Relief from judgment may be granted only when a defendant shows that actual prejudice from the alleged irregularities that support the claim for relief was suffered. Actual prejudice means that with respect to a conviction following a trial, but for the alleged error, the defendant would have had a reasonably likely chance of acquittal, MCR 6.508(D)(3)(b)(i), or that, in any case, because the irregularity was so offensive to the maintenance of a sound judicial process the conviction should not be allowed to stand regardless of its effect on the outcome of the case, MCR 6.508(D)(3)(b)(iii). While postappeal the judge . may have found prejudice under MCR 6.508(D)(3)(b)(iii), in that she characterized the errors as serious enough to constitute a miscarriage of justice without regard for their effect on the outcome of the trial, the majority of the Court of Appeals, having found that failure to raise certain alleged improprieties on direct appeal did not constitute "good cause" under MCR 6.508(D)(3)(a), did not rule on whether the alleged errors caused the defendant actual prejudice.

Because the judge referred to neither of the definitions of actual prejudice under MCR 6.508(D)(3)(b)(i), (iii) in granting the defendant's motion for postappeal relief, and the Court of Appeals did not address the issue of actual prejudice, remand

to the trial court should be required for further exposition regarding the issue.

Justice WEAVER took no part in the decision of this case.

198 Mich App 639; 499 NW2d 441 (1993) affirmed.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Timothy A. Baughman,* Chief, Research, Training and Appeals, and *Thomas M. Chambers,* Assistant Prosecuting Attorney, for the people.

*Elizabeth L. Jacobs* for the defendant.

Amici Curiae:

*Sandra Girard* for Prison Legal Services of Michigan, Inc.

*Joan E. Morgan* for Criminal Defense Attorneys of Michigan.

*Barbara R. Levine* for Michigan Appellate Assigned Counsel System.

BOYLE, J. "Cause" for excusing procedural default is established by proving ineffective assistance of appellate counsel, pursuant to the standard set forth in *Strickland v Washington,* 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984), or by showing that some external factor prevented counsel from previously raising the issue. MCR 6.508 protects unremedied manifest injustice,[1] preserves

---

[1] MCR 6.508(D) recognizes that the most fundamental injustice is the conviction of an innocent person and specifically allows the court to waive "the 'good cause' requirement of subrule (D)(3)(a) if it concludes that there is a significant possibility that the defendant is innocent of the crime." If the petitioner in fact demonstrates that there is a significant possibility that he is innocent, the court may consider his claim without requiring the petitioner to demonstrate good cause for his failure to raise the issue in an earlier proceeding.

professional independence, conserves judicial resources, and enhances the finality of judgments.

Six justices agree that in postconviction proceedings under MCR 6.508(D)(3)(a),[2] "good cause for failing to raise issues [of ineffective assistance of counsel] on the first appeal"[3] is not defined as failure to comply with standard 9 of the Minimum Standards for Indigent Criminal Appellate Defense Services. The Minimum Standards[4] require appellate counsel to raise all claims of "arguable legal merit," and a failure to raise an arguable claim does not establish the proper test for assessing whether a defendant has established "cause" excusing a procedural default in postconviction proceedings. The definition proposed is inconsistent with the purpose and language of the Rules of Criminal Procedure, with federal authority defining ineffective assistance of trial and appellate counsel as cause, and with our holding in *People v Pickens,* 446 Mich 298; 521 NW2d 797 (1994).

However, we disagree with Justice CAVANAGH that "federal habeas corpus jurisprudence should play only a limited role in defining the standards imposed by MCR 6.508." *Post* at 402. As Justice CAVANAGH notes, federal habeas corpus review and MCR 6.508 share the paramount goal of promoting finality of judgments. *Post* at 404. Moreover, in both the federal and state systems, the constitution guarantees only a fair trial, not a perfect one. *Murray v Carrier,* 477 US 478; 106 S Ct 2639; 91 L Ed 2d 397 (1986); *People v Bahoda,* 448 Mich 261, 292-293; n 64; 531 NW2d 659 (1995). While it is true that the state can create its own procedural rules, we presumably chose to model MCR 6.508 after the federal habeas corpus statute

[2] See n 2, *post* at 406.

[3] *Id.* at 408.

[4] Adopted by this Court in Administrative Order No. 1981-7.

because it serves important state interests. As the Supreme Court has observed, the exhaustion doctrine,[5] promotes the legitimate interest of this state in enhancing the accuracy, efficiency, and reliability of our own criminal process by assessing and resolving appellate issues shortly after trial. *Murray v Carrier, supra.*

We also believe that Justice CAVANAGH has failed to advance a persuasive reason why the habeas corpus standard articulated in *Gray v Greer,* 800 F2d 644 (CA 7, 1985), not passed upon by the Court of Appeals, should be adopted here. As the Court now assumes for itself the role of adding judicial gloss to the terms."significant and obvious," the approach marks at least a partial repudiation of the limiting purpose of MCR 6.508. The burdens on trial courts passing on postconviction claims will be clearly expanded to the extent of . demonstrating compliance with *Gray* and, in fact, may be further expanded. The observation that the strategic decisions of counsel will be respected "if such discretion was actually exercised," invites the argument that a *Ginther* hearing with appellate counsel must be held to determine that question.[6] *Post* at 405.

---

[5] In the debate regarding the appropriate scope of federal habeas corpus review, *one* cost identified by those who support a less expansive view is the inconsistency of plenary review of state decisions with the " 'constitutional balance upon which the doctrine of federalism is founded,' " 3 LaFave & Israel, Criminal Procedure, § 27.2, p 302, quoting *Schneckloth v Bustamonte,* 412 US 218; 93 S Ct 2041; 36 L Ed 2d 854 (1973). Another cost is the consumption of scarce judicial resources. *Id.*

[6] *People v Ginther,* 390 Mich 436; 212 NW2d 922 (1973). Justice O'Connor's words regarding the costs of such hearings are equally applicable here.

In order to determine whether there was cause for a procedural default, federal habeas courts would routinely be required to hold evidentiary hearings to determine what prompted [appellate] counsel's failure to raise the claim in

The Rules of Criminal Procedure "are to be construed to secure simplicity in procedure, fairness in administration, and the elimination of unjustifiable expense and delay." MCR 6.002. The specific purpose for creating the postconviction procedure was to provide finality of judgments affirmed after one full and fair appeal and to end repetitious motions for new trials. MCR 6.508(D) is identical to the federal standards for habeas corpus relief under 28 USC 2255. Postconviction relief is provided for the extraordinary case in which a conviction constitutes a miscarriage of justice.

Requiring appellate lawyers to function at a level of objectively reasonable performance encourages lawyers to accept assignments and to diligently serve their clients, as well as promoting the goal of finality in judgments. Where a procedural default is the result of ineffective assistance of counsel, the Sixth Amendment mandates that the state bear the risk of the constitutionally deficient performance. However, where the state has afforded a full and fair opportunity to reliably determine guilt and an appeal of right, assisted by constitutionally adequate counsel at public ex-

question. While the federal habeas courts would no doubt strive to minimize the burdens to all concerned through the use of affidavits or other simplifying procedures, we are not prepared to assume that these costs would be negligible, particularly since, as we observed in *Strickland v Washington*, 466 US 668, 690 (1984), "[i]ntensive scrutiny of counsel . . . could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client." Nor will it always be easy to clarify counsel's behavior in accordance with the deceptively simple categories propounded by the Court of Appeals. Does counsel act out of "ignorance," for example, by failing to raise a claim for tactical reasons after mistakenly assessing its strength on the basis of an incomplete acquaintance with the relevant precedent? The uncertain dimensions of any exception for "inadvertence" or "ignorance" furnish an additional reason for rejecting it. [*Murray, supra* at 487-488.]

pense, all institutional and public interests support the conclusion that proceedings should come to an end unless the defendant's conviction constituted a miscarriage of justice.

When ineffective assistance of counsel, based on a failure to raise viable issues, is the justification for excusing procedural default, the movant must establish ineffective assistance of counsel pursuant to the standard set forth in *Strickland v Washington, supra,* or that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v Carrier, supra* at 488. MCR 6.508 is based on federal precedent and Michigan's standard for ineffective assistance of trial counsel is the same as the federal standard. *People v Pickens, supra.* "Attorney error short of ineffective assistance of counsel does not constitute cause for a procedural default even when that default occurs on appeal rather than at trial." *Murray* at 492.

Defining ineffective assistance of appellate counsel as the failure to raise any arguable claim would impair the independence of the profession. And because failure to raise all colorable claims will expose appellate lawyers to malpractice suits and grievances, the approach would inevitably result in flooding the appellate courts with non-meritorious claims on direct appeal. Moreover, because in hindsight, the number of claims of arguable legal merit is virtually limitless, it is predictable that lawyers either will decline representation that will expose them to grievances and civil sanctions, or will suggest that funding units should underwrite the cost of malpractice insurance.

The ultimate effect would profoundly destabilize the finality of judgments beyond what occurred under the previous procedure, and exponentially

increase the burdens on appellate counsel, the
Court of Appeals, and trial courts presiding in
collateral matters. Such an approach is neither
commanded by the constitution nor justified by
sound public policy.

I

The commentary to MCR 6.508 states that the
"cause and prejudice" standard is based on the
United States Supreme Court decisions in *Wain-
wright v Sykes,* 433 US 72; 97 S Ct 2497; 53 L Ed
2d 594 (1977), and *United States v Frady,* 456 US
152; 102 S Ct 1584; 71 L Ed 2d 816 (1982). In
*Wainwright,* the United States Supreme Court
held that the "[r]espondent's failure to make
timely objection under the Florida contemporaneous-
objection rule to the admission of his inculpa-
tory statements, absent a showing of cause for the
noncompliance and some showing of actual preju-
dice, bars federal habeas corpus review of his
*Miranda*[7] claim." *Id.* at 72 (reporter's syllabus).

While *Wainwright* adopted the cause and preju-
dice standard, it left "open for resolution in future
decisions the precise definition . . . ." *Id.* at 87.
Similarly, in *Frady, supra,* the Court applied the
cause and prejudice standard but found "it unnec-
essary to determine whether Frady ha[d] shown
cause" and "refrained from giving 'precise content'
to the term 'prejudice' . . . ." *Frady* at 168, citing
*Wainwright, supra* at 91. Thus, while laying the
groundwork for the cause and prejudice standard,
*Wainwright* and *Frady* offered limited guidance
regarding the proper definition of either term.

However, in *Strickland,* the United States Su-
preme Court clearly held that to receive collateral

---

[7] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694
(1966).

relief on the basis of ineffective assistance of trial counsel, the defendant must meet a two-pronged test of both cause and prejudice. In addressing the "cause" prong of the test, *Strickland* held that the defendant must show that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. In evaluating whether counsel was ineffective, "[j]udicial scrutiny of counsel's performance must be highly deferential," and the court should restrain from second-guessing trial strategy. *Id.* at 689. "There are countless ways to provide effective assistance," and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.* Thus, with regard to defaults that occur at trial, error or inadvertence is not cause for procedural default in postconviction proceedings. *Murray, supra* at 487.

*Strickland* dealt with allegations of ineffective assistance of trial counsel as cause (and prejudice) for procedural defaults in collateral proceedings. In *Murray,* the Supreme Court also definitively held that a failure to assert a claim on appeal whether from "ignorance or inadvertence rather than from a deliberate decision," does not constitute cause for purposes of postconviction relief. *Id.* at 487. "Attorney error short of ineffective assistance of counsel does not constitute cause for a procedural default even when that default occurs on appeal rather than at trial." *Id.* at 492. In *Murray,* the Supreme Court dismissed the respondent's habeas corpus petition because the respondent failed to show cause for not raising his ineffective assistance claim on direct appeal. In reaching its decision, the Court squarely addressed the standard for "cause" and, applying *Strickland,* held that "cause" for appellate default could be

established only by proving ineffective assistance of counsel pursuant to *Strickland,* or by showing that some factor external to the defense precluded counsel from previously raising the issue. *Id.*[8]

Where trial or appellate counsel's performance is constitutionally defective, procedural defaults will not bar a remedy for manifest injustice. However, the vestigial definition of "cause" contended for would transform postconviction proceedings into the "main event" of the criminal justice system, with significant cost to the entire system and to the public interest. If a defendant received a fair trial, was represented at trial and on appeal by a constitutionally adequate lawyer, no legitimate interest is served in excusing procedural default.

II

The appellant contends that standard 9 of the Minimum Standards is the proper test for whether the defendant has shown "cause." *Post* at 412-413. Standard 9 requires an appellate attorney to assert every claim of "arguable legal merit." Thus, an appellate attorney's failure to raise an issue on direct appeal that would not have succeeded had it been raised, would excuse a procedural default under MCR 6.508(D). The Minimum Standards dictate only whether an attorney who is listed on the roster of attorneys at the Appellate Assigned Counsel Administrator's office is eligible for assignments. The standards are simply the vehicle adopted by this Court to assure a standard of

[8] External factors include "showing that the factual or legal basis for a claim was not reasonably available to counsel, see *Reed v Ross,* 468 US [1, 16; 104 S Ct 2901; 82 L Ed 2d 1 (1984)], or that 'some interference by officials,' *Brown v Allen,* 344 US 443, 486 [73 S Ct 397; 97 L Ed 469] (1953), made compliance impracticable . . . ." *Murray, supra* at 488.

performance by certain attorneys who seek to represent clients at state expense. They do not establish the definition of "cause" in collateral relief. Unlike the Minimum Standards, "the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation . . . . The purpose is simply to ensure that criminal defendants receive a fair trial." *Strickland, supra* at 689.

The commentary to standard 9 states that it is based on this Court's opinion in *People v Garcia,* 398 Mich 250; 247 NW2d 547 (1976). Just last term, however, we held that "the Michigan Constitution does not afford greater protection than federal precedent with regard to a defendant's right to counsel when it involves a claim of ineffective assistance of counsel." *People v Pickens, supra* at 302. In reaching our decision we stated, "*Garcia,* therefore, does not stand for the proposition that the Michigan Constitution was intended to grant stronger protection than federal authority with regard to the standards applied to the issue of ineffective assistance of counsel." *Id.* at 312-313. Thus, contrary to the understanding of the drafters of standard 9, our holding in *Garcia* does not suggest a departure from federal precedent, but rather embodies the federal standard.

Defining "cause" as any deviation from compliance with an exact set of standards was considered and rejected in the context of trial counsel performance in *Strickland.* The Court refused to adopt a "particular set of detailed rules for counsel's conduct," finding that no specific set of standards "can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland, supra* at 688-689.

Likewise, requiring appellate counsel to raise every arguably meritorious issue would undermine the strategic and discretionary decisions that are the essence of skillful lawyering. A fair trial defended by constitutionally competent trial counsel and reviewed with the representation of constitutionally competent appellate counsel is a final judgment, subject to reversal only in the extraordinary circumstances set forth in the rule.

Inherent in the definition of "arguable legal merit" is the notion that attorneys will disagree about what issues are "arguable."[9] By adopting a standard of arguable merit, the Minimum Standards encourage lawyers representing indigent clients on appeal to err on the side of presenting all colorable claims for relief. Although the standard undoubtedly imposes a tax on the resources of the Court of Appeals, it is arguable that the burden is justified by the institutional need to assure that appellate attorneys paid by the taxpayers of Michigan do not err on the side of underrepresentation. It is one thing, however, to encourage lawyers to raise claims on direct appeal that conceivably might succeed, and quite another to say that failure to raise all such claims is constitutionally defective. If failure to raise a claim of "arguable legal merit" constituted "cause" in collateral proceedings, the standard would constitute a frontal attack on the finality of judgments that the Rules of Criminal Procedure were adopted to promote

---

[9] If reasonable legal minds can differ about whether a claim has "arguable legal merit," the standard is reduced to one in which mere negligence or simple oversight is sufficient to fulfill the cause prong. The Supreme Court has directly rejected such a standard and has stated that "the defendant bears the burden of proving that counsel's representation was unreasonable" and that "[o]nly those habeas petitioners who can prove under *Strickland* that they have been denied a fair trial by the *gross incompetence* of their attorneys" will be able to obtain relief. *Kimmelman v Morrison,* 477 US 365, 381, 382; 106 S Ct 2574; 91 L Ed 2d 305 (1986) (emphasis added).

without any benefit to the notion that collateral proceedings are intended as extraordinary protection against unreliable fact finding and unjust convictions.[10] The standard does not consider the presumption of competence inherent in the wide range of reasonable appellate assistance, nor does it address the fact that for purposes of appeal, as at trial, the constitution does not guarantee a perfect process, but rather one that is not constitutionally defective.

### III

Before October 1, 1989, the procedure for collateral review of criminal convictions in Michigan did not make any provision for finality of judgments. As a consequence, defendants could, and did, repeatedly seek relief without limitation. To create a uniform system of procedure, Michigan Court Rules 6.501 *et seq.* were enacted. The rules present a carefully balanced scheme that liberally permits the assertion of claims on direct appeal,[11] whether timely or not, while at the same time introducing a concept of finality to discourage repeated trips up and down the appellate ladder.

In explaining the proper standard for collateral postconviction relief, the drafters of proposed rule 7.404, later adopted as MCR 6.508, stated:

> The collateral postconviction remedy provided by subchapter 7.400 should be regarded as extraordinary. Lacking any statute of limitations, this remedy has the potential for seriously undermin-

---

[10] An expansive definition of cause for failure to raise issues on appeal may actually have the effect of discouraging diligent performance on direct appeal.

[11] MCR 6.425(F)(1)(b).

ing the state's important interest in the finality of criminal judgments. Such a cost is appropriate only to prevent manifest injustice. Stated differently, collateral postconviction remedies should have a narrower role than direct appeal; errors that may warrant appellate reversal of a conviction may not warrant postconviction relief. [Proposed Rules of Criminal Procedure, 428A Mich 50 (1987).]

Specifically addressing ineffective assistance of appellate counsel claims, the drafters stated that "ineffective assistance of counsel, as opposed to mere attorney oversight, establishes cause for failure to raise the issue." *Id.* at 53.

The rules are designed to encourage raising legal issues on initial appeal rather than in postconviction review. The United States Supreme Court has observed:

[A rule which is designed to afford] the opportunity to resolve the issue shortly after trial, while evidence is still available both to assess the defendant's claim and to retry the defendant effectively if he prevails in his appeal . . . promotes not only the accuracy and efficiency of judicial decisions, but also the finality of those decisions . . . . [*Reed v Ross,* 468 US 1, 10; 104 S Ct 2901; 82 L Ed 2d 1 (1984).]

MCR 6.508 was adopted to insure that the finality of criminal judgments was not diminished. Mandating that all appellate attorneys must raise all claims of arguable legal merit will tax judicial resources on direct and postconviction attack, and reintroduce a multiplicity of postconviction proceedings. Neither the guarantee of a fair trial nor a direct appeal entitles a defendant to as many

attacks on a final conviction as ingenuity may devise.[12]

## IV

The facts of this case present a paradigm of the situation MCR 6.508 seeks to remedy. It has been eight years since defendant, assisted by a different lawyer than trial counsel, sought relief through direct appeal. The appeal followed a three-day jury trial at which defendant was convicted of felony murder. On direct appeal, appellate counsel raised two issues: that the jury instructions were unclear and overly broad, and that it was error for the prosecutor to inform the jury that defendant's alleged codefendant had already been tried.

Defendant here claims that his appellate counsel was ineffective for not arguing that his trial counsel was ineffective in failing to object to three statements made in the prosecutor's closing argument. To excuse this double procedural default defendant must "show that [trial] counsel's performance fell below an objective standard of reasonableness, and that the representation so prejudiced the defendant as to deprive him of a fair trial." *Pickens, supra* at 303. Defendant must also show that appellate counsel's performance fell below an objective standard of reasonableness and was constitutionally deficient.

While not insurmountable, it is clear that this burden is highly demanding. As Justice Brennan explained in *Kimmelman v Morrison,* 477 US 365; 106 S Ct 2574; 91 L Ed 2d 305 (1986):

---

[12] The Supreme Court has recently observed that the fundamental miscarriage of justice exception seeks "to balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case." *Schlup v Delo,* 513 US —; 115 S Ct 851, 865; 130 L Ed 2d 808 (1995).

In order to establish ineffective representation, the defendant must prove both incompetence and prejudice. [*Strickland, supra*] at 688. There is a strong presumption that counsel's performance falls within the "wide range of [reasonable] professional assistance," *id.* at 689; the defendant bears the burden of proving that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy. *Id.* at 688-689. The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential. *Id.* at 689. [*Id.* at 381.]

Since "[t]here are countless ways to provide effective assistance in any given case," *id.* at 689, unless consideration is given to counsel's overall performance, before and at trial, it will be "all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Ibid.* [*Id.* at 386.]

A

Dealing with the defaults in reverse order, we first observe that under the deferential standard of review, appellate counsel's decision to winnow out weaker arguments and focus on those more likely to prevail is not evidence of ineffective assistance. *Jones v Barnes,* 463 US 745, 752; 103 S Ct 3308; 77 L Ed 2d 987 (1983). Nor is the failure to assert all arguable claims sufficient to overcome the presumption that counsel functioned as a reasonable appellate attorney in selecting the issues presented. The question is whether a reasonable appellate attorney could conclude that the comments made by the prosecutor were not worthy of mention on appeal.

Since, as discussed next, two of the three comments were not improper statements of law and all were followed by proper instruction, it is evident that the improper comments argument was without merit.

B

The claimed ineffective performance of trial counsel, is based on three instances of alleged prosecutorial misconduct where trial counsel's failure to object subjected each alleged error to the claim of forfeiture on direct appeal,[13] see *People v Duncan,* 402 Mich 1; 260 NW2d 58 (1977). The question is whether trial counsel's failure to object to the following three points during a three-day trial constituted constitutionally deficient performance: (1) the prosecutor's alleged implication that first-degree murder is satisfied if the murder occurred during the course of the robbery without fully explaining that there must be malice sufficient for murder itself and a separate intent to commit the underlying felony, (2) the prosecutor's explanation that "not caring" or "careless disregard" would satisfy the specific intent required for assault with intent to murder, and (3) the prosecutor's use of "we know" in referring to the evidence produced at trial, allegedly implying that he knew something more than produced at trial, that the evidence was abundantly clear, or simply that the jury should suspend its fact-finding powers in deference to the prosecutor's judgment. All instances of alleged defective performance occurred during closing argument. It is not disputed that all were followed by correct jury instructions.

---

[13] The contemporaneous objection rule is supported by the notion that it is the trial that is the main event and that the person best qualified to judge error, which denies fundamental fairness, is normally defendant's own trial lawyer. *Murray, supra* at 506.

Although we find no "cause," we analyze each of the claims separately to provide guidance to the bench and bar.[14]

Defendant claims trial counsel erred in failing to object to the prosecutor's argument regarding felony murder.

Review of the relevant statements in the record indicate that the prosecutor did not misstate the law:

> Whether the persons had the gun in their right hand or their left hand, whether there were fifteen bullets fired or twenty-two bullets fired may not matter. If you believed that Lee Griffin died during the robbery or an attempted robbery, that Mr. Reed shot the fatal shot or was responsible for it being fired, it would still be murder in the first degree, felony murder. If he shot Mr. Moore intending to kill, intending what happened, he's guilty of assault with intent to murder. If he was just holding and pulled out his weapon on the participants at this bar, he's guilty of assault with intent to rob being armed. If he's holding a gun in his hand, he's guilty of possessing a firearm during the commission of a felony.
>
> *     *     *
>
> For murder in the first degree, the Judge is going to define that there has to be a loss of life. Mr. Griffin lost his life. It had to be caused by an act of the Defendant. Being shot was the act that caused his death. And there had to be a mental

---

[14] While we analyze each claim of error separately, and recognize that "the right to effective assistance of counsel . . . may in a particular case be violated by even an isolated error . . . if that error is sufficiently egregious and prejudicial," *Murray, supra* at 496, we emphasize again that each error must be assessed in relation to "counsel's overall performance, before and at trial." *Kimmelman, supra* at 386. It is only when a defendant can demonstrate that a single egregious error, or combination of minor errors, caused counsel's overall performance to fall below the level guaranteed by the Sixth Amendment that defendant has fulfilled the cause prong of the inquiry.

state, a mental state of either wanting to kill or disregarding the consequences of the activity, not caring what happened, in this case, shooting a person, to the extent of shooting at the vital organs, that kind of not caring—I'm going to help my friend, I'm going to shoot you.

You don't have to intend "I'm going to kill him." All you have to do is, "I'm going to shoot him. I don't care if this bullet kills or not."

And it has to be done during an attempted robbery. This certainly was an attempted robbery. Even if Mr. Sharp may have been the one more intimately involved in the whole event—he's taken care of—look at Mr. Reed's responsibility, and his shooting Mr. Griffin with disregard for what's going to happen, causing the fatal wound while a robbery is going down is murder in the first degree.

And the Court has to instruct you on murder in the second degree. That's just a killing with a wrongful intent, a wrongful state of mind, whether part of a robbery or not. That's murder in the second degree.

But the killing when you're trying to advance a robbery is first, murder in the first degree. Not that it's planned or premeditated or cold-blooded, but that it's done during the robbery. That's murder in the first degree. And for that we charge Mr. Reed for being involved in that act of murder in the first degree.

And we know that he also shot Mr. Moore twice, in the chest and in the arm. First in the arm would make sense. If he's holding the gun the way he said, he would shoot him in the arm which has the gun in it, which caused him to let go of the arm [sic].

Then he shot him in the chest, for which we charge him with assault with intent to murder, intent to kill; the Defendant didn't care what happened when he shot him. He shot him in the chest, which is a pretty serious place. He's lucky. He was shot twice in the trunk and survived. Mr. Griffin was shot once in the trunk and he died.

I think the fact that one man died shows that the intent was to kill, to not care, not caring what the results would be. And again, Mr. Moore said that Mr. Reed was the one who was shooting at him. "I looked up and I saw him shooting at me. The second and third wounds that I received came from Mr. Reed."

The prosecutor argued that shooting at Mr. Griffin's vital organs satisfied the malice required for second-degree murder. He did not misstate the law or lessen the burden of proof regarding the malice requirement for murder.[15] See *People v Aaron,* 409 Mich 672; 299 NW2d 304 (1980).

The prosecution concedes that the trial prosecutor misstated the intent requirement of assault with intent to murder charge. He stated:

Then he shot him in the chest, for which we charge him with assault with intent to murder, intent to kill; the Defendant didn't care what happened when he shot him. He shot him in the chest, which is a pretty serious place. He's lucky. He was shot twice in the trunk and survived. Mr. Griffin was shot once in the trunk and he died.

We are not bound to accept such a concession, and it may well be that the prosecutor was correctly arguing that an intention to kill may be inferred from circumstances. Nonetheless, assuming arguendo the correctness of the concession, an intent to kill is necessary to convict of assault with intent to murder. *People v Taylor,* 422 Mich 554, 567-568; 375 NW2d 1 (1985). We find that counsel was not

[15] It is undisputed that the trial judge gave an appropriate instruction regarding felony murder. The prosecutor also notes that the jury asked for clarification of the difference between felony murder and second-degree murder and the trial judge reread his previous instruction. This strengthens the fact that the jury was not confused and that the prosecutor's comments did not prejudice defendant.

ineffective in failing to object because, at the time of trial, *Taylor* was not yet decided.

Counsel is not ineffective for taking a position that, while objectively reasonable at the time, is later ruled incorrect. *McMann v Richardson,* 397 US 759, 770-771; 90 S Ct 1441; 25 L Ed 2d 763 (1970). The question is whether the position when taken was objectively reasonable pursuant to the standard set forth in *Strickland, supra.*[16] We are mindful of the *Strickland* Court's warning that "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful [or later deemed incorrect], to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689. Thus, trial counsel was not ineffective in failing to object to the prosecutor's argument.[17]

---

[16] Defendant does not contend that counsel should have foreseen the subsequent clarification of the law in *Taylor. Smith v Murray,* 477 US 527; 106 S Ct 2661; 91 L Ed 2d 434 (1986).

[17] The trial judge instructed the jury, in accordance with CJI 17:2:01 and 17:2:02 (now CJI2d 17.3 and 17.4), as follows:

Now with regard to count two, the Defendant is charged with assault with intent to murder Johnny Ray Moore. Any person who shall assault another with the intent to commit the crime of murder is guilty of this crime. The Defendant pleads not guilty to this charge.

To establish this charge, the Prosecution must prove each of the following elements beyond a reasonable doubt:

First, that the Defendant tried to physically injure another person.

Second, that he had the present ability to cause the injuries or at least believed that he had the present ability.

Third, that at the time he committed the assault, the Defendant intended to kill the complainant under circumstances that did not justify, excuse or mitigate the crime.

Now, this also requires a specific intent, and if you find that the Defendant for any reason whatsoever did not consciously and knowingly act with the intent to kill Johnny Ray Moore, then the crime cannot have been committed, and you must find the Defendant not guilty of the crime of assault with intent to commit the crime of murder. If from all the evidence you have a reasonable doubt as to whether or not the Defendant knowingly and consciously acted with the intent to kill, then you

The final claim is that trial counsel erred in failing to object to the prosecutor's use of the term "we know" in summing up the evidence in his closing argument.[18] This claim is based on the

---

must find the Defendant not guilty of the crime of assault with intent to commit the crime of murder.

[18] The prosecutor made the following comments:

What we do know is that two men went to the bar. I think we know that clearly. Two men went to the bar for the purpose of holding it up, Albert Reed and Mr. Keith Sharp.

\* \* \*

All we know is that he [Willie Burns] took the two men to the bar and that both men were armed with weapons; that Mr. Albert Reed had a .38 caliber in his belt or what looked like a .38 caliber, and Mr. Sharp had a 9 millimeter that he was playing with. So both men went to the bar armed.

\* \* \*

He [Mr. Sharp] pulls out a gun and then a holdup is announced. We're not sure who says it, but a holdup is announced.

But we know at some point in time Mr. Reed is seen at the door holding a gun. Mr. Sharp is at the front of the bar holding the gun. So both men are holding a gun, and they're clearly part of the holdup attempt.

\* \* \*

And the photograph and the sketch shows there's some slugs in the back room. So we know Keith Sharp goes in the back of the bar, leaving twenty people in the bar. We know there must be somebody else involved in the holdup. There's no way he could be pulling off this holdup by himself, announce a holdup and then leave the room for a minute without backup from Albert Reed, who's standing at the door.

\* \* \*

And according to the medical examiner's testimony, the fatal wound that Mr. Griffin suffered in the chest was slightly downward, indicating the person shooting would have had to have been standing upward, somewhere above, to shoot in the chest, for the bullet to go a slightly downward angle. It couldn't have been Mr. Sharp on the floor because Mr. Moore covered him as he was fighting with him. Besides that, we know that Mr. Griffin was eventually on the other side of the pool table, which would have blocked his view. So he couldn't even see Mr. Griffin on the floor because it's on the other side of the pool table.

\* \* \*

theory that trial counsel should have objected during the prosecutor's closing argument because the prosecutor was impermissibly vouching for the credibility of the witnesses. We believe a claim of this type is precisely the type of trial decision the United States Supreme Court cautioned against second guessing in postconviction collateral proceedings.

First, as a matter of law, the argument did not constitute improper vouching. It is not here disputed "that the prosecutor may not vouch for the character of a witness or place the prestige of his office behind them." *People v Bairefoot,* 117 Mich App 225, 229; 323 NW2d 302 (1982); see also *People v Bahoda, supra; People v Cowell,* 44 Mich App 623; 205 NW2d 600 (1973). The record must be read as a whole, however, and the allegedly impermissible statements judged in the context in

We do know that a .38 was fired, and a .38 was held by Mr. Reed, and a .38 jacket was found next to the pool table.

\* \* \*

You have the medical examiner's testimony as to the angle being downward, and we have the .38 slug or the jacket of a .38 slug found, which could not have come out of Mr. Keith Sharp's gun. So we know that Mr. Reed fired the fatal shot.

\* \* \*

And we know that he also shot Mr. Moore twice, in the chest and in the arm. First in the arm would make sense. If he's holding the gun the way he said, he would shoot him in the arm which has the gun in it, which caused him to let go of the arm [sic].

\* \* \*

And we certainly know that Mr. Reed was possessing a firearm, a .38. Mr. Willie Burns saw it. Mr. Alvira saw it.

\* \* \*

What we do know is that Mr. Reed is the mobile one, the one that was able to walk around. We know that Mr. Griffin is still standing and could be turning in a certain direction, turning to face the man who's pulling out a gun on his friend and himself.

And we do know that other shots are being fired by Mr. Reed on Mr. Moore.

which they are made. *People v Duncan, supra* at
15-16. As noted by the Court of Appeals in *Cowell,
supra:*

> A statement cannot be taken out of context. Just
> as jury instructions must be read as a whole, so
> must the remarks of the prosecutor. The pros-
> ecutor's remarks must be evaluated in light of the
> relationship or lack of relationship they bear to
> the evidence admitted at trial. [*Id.* at 627.]

The propriety of the prosecutor's comments "does
not turn on whether or not any magic words are
used." *Id.* at 628. The crucial inquiry is not
whether the prosecutor said "We know" or "I
know" or "I believe," but rather whether the
prosecutor was attempting to vouch for the defen-
dant's guilt.

Read as a whole, and in the context of this case,
the prosecutor's use of "we know" does not show
an attempt to place the credibility of his office
behind the case or a suggestion that he possessed
extrajudicial information on which defendant
should be convicted.[19] Rather, the prosecutor was
asserting that "we know," on the basis of the
evidence presented at trial and inferences drawn
from that evidence, that the propositions advanced
had been established.[20]

---

[19] See also *Therrien v Vose,* 782 F2d 1, 4 (CA 1, 1986), in which the
United States Court of Appeals for the First Circuit, rejecting the
petitioner's habeas petition, held that the prosecutor's use of "we
know he shot them" was not prosecutorial misconduct because the
prosecutor had previously instructed the jury that it was their recol-
lection of the evidence and not his that "counts."

[20] Moreover, the trial court judge instructed the jury as follows:

> You are the sole judges of the facts, and you alone have the
> solemn duty and obligation to decide this case from the evi-
> dence.
> Any statements and arguments of the attorneys are not
> evidence, but are only intended to assist you in understanding
> the evidence and the theory of each party.

Second, trial strategy supports counsel's decision not to object. Objecting would have invited an overruling by the trial judge and risked jury disapproval. At best, trial counsel might have obtained a direction to the prosecutor to rephrase his summary, or a charge that the lawyer's arguments were not evidence. Trial counsel had to balance this meager benefit against the potential that the jury would believe defense counsel did not want them to hear the prosecutor's analysis of the evidence. Trial counsel's failure to object was a quintessential example of trial strategy. None of the omissions alleged, standing alone or together, falls below an objective standard of reasonable performance.

C

Finally, we observe that if the first prong of *Strickland* is satisfied because a reasonable attorney would have objected, in this collateral proceeding, the defendant could not fulfill the prejudice prong. See also *People v Pickens, supra.* The *Strickland* formulation of ineffective assistance includes both a performance component and a prejudice component. Both prongs of the test must be fulfilled and

> a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffective-

* * *

You should disregard anything said by an attorney which is not supported by the evidence or by your own general knowledge and experience.

ness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. [*Id.* at 697.]

To establish prejudice, "a criminal defendant . . . must show 'that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' " *Lockhart v Fretwell,* 506 US 364, 369; 113 S Ct 838; 122 L Ed 2d 180 (1993), quoting *Strickland, supra* at 687.[21]

Defendant in this case received a fair trial and there are no circumstances that undermine confidence in the reliability of the factfinder's determination of guilt. Given the well-established proposition that jurors are presumed to follow the law, an alleged misstatement of the law by the prosecutor is presumptively not harmful, since the trial judge instructed the jury properly.

Moreover, a witness who was himself shot twice by Mr. Reed, testified that he saw defendant fatally shoot the victim during the attempted robbery, and three witnesses identified defendant as being in the bar at the time of the shooting. Another witness for the people testified that he drove defendant to the bar on the day in question, that defendant was armed with a .38 caliber revolver, and that when defendant returned to the car, either the defendant or Sharp said "I had to shoot the dude." A man working on a freezer identified defendant as the man with a revolver in his hand who ordered him out of the bathroom after the shots were fired. There was no prejudice or manifest injustice so that the good cause requirement should be waived.

---

[21] The proper inquiry is not whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland, supra* at 694. An analysis that focuses "solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Lockhart v Fretwell, supra* at 369.

V

We agree with the Court of Appeals that appellate counsel did not fall below the standard of *Strickland* by failing to claim that trial counsel was ineffective. Trial counsel's performance was constitutionally adequate, and defendant's counsel on direct appeal did not render ineffective assistance by failing to raise meritless claims.

Because defendant has failed to demonstrate "cause" as required by MCR 6.508(D)(3), we would affirm the decision of the Court of Appeals and reinstate defendant's convictions and sentences.

BRICKLEY, C.J., and RILEY, J., concurred with BOYLE, J.

CAVANAGH, J. (*concurring in part and dissenting in part*). I agree with Justice BOYLE that the right to effective assistance of appellate counsel does not necessarily require that appellate counsel advance every conceivable issue on appeal. I write separately, however, to emphasize my belief that federal habeas corpus jurisprudence should play only a limited role in defining the standards imposed by MCR 6.508.

I

The primary motivation behind the writ of habeas corpus is to provide a mechanism whereby state prisoners can seek redress of their federal rights. A federal habeas corpus claim is based on the theory that the prisoner is being held in violation of the federal constitution or federal law and, thus, his imprisonment is unconstitutional or otherwise illegal. 28 USC 2254(a). Nevertheless, federal courts are increasingly reluctant to interfere with state court judgments because of the

concepts of comity and federalism; thus, habeas corpus relief is sparingly granted. *Coleman v Thompson,* 501 US 722, 730-731; 111 S Ct 2546; 115 L Ed 2d 640 (1991).

As the New Jersey Supreme Court has recently, and unanimously, observed:

> It would be a bitter irony indeed if our courts, in an attempt to accommodate the [United States] Supreme Court's retrenchment of federal habeas corpus review, were artificially to elevate procedural rulings over substantive adjudications in post-conviction review, at a time when the Court's curtailment of habeas review forces state prisoners to rely increasingly on state post-conviction proceedings as their last resort for vindicating their state and federal constitutional rights. *When appropriate, the procedural bars imposed by Rules 3:22-4, 3:22-5, and 3:22-12 may be asserted to preclude post-conviction relief, but their use should not be shaped or influenced in the slightest by the federal courts' restrictive standards for allowing or disallowing habeas review.* [*New Jersey v Preciose,* 129 NJ 451, 477; 609 A2d 1280 (1992). Emphasis added.]

Thus, the curtailment of habeas corpus review is based on a theory of federalism that subordinates the vindication of federal constitutional rights to a state's enforcement of its procedural rules. *Id.* at 472.

It seems evident to me that the concepts of comity and federalism are simply inapplicable to MCR 6.508. Therefore, the more prominence these concepts gain in federal habeas corpus jurisprudence, the less that jurisprudence should influence our interpretation of MCR 6.508. MCR 6.508 is intended to force a defendant to bring all his appellate claims in his appeal of right, thereby promoting the finality of judgments, and is not concerned in the least with comity or federalism.

This is not to say that federal habeas corpus jurisprudence is of no use whatsoever. The limited usefulness of that jurisprudence in interpreting the meaning of "good cause" is evidenced by the citation in the committee notes of MCR 6.508 of *United States v Frady,* 456 US 152; 102 S Ct 1584; 71 L Ed 2d 816 (1982), and *Wainwright v Sykes,* 433 US 72; 97 S Ct 2497; 53 L Ed 2d 594 (1977). However, the committee citations of these cases surely do not mean that it also was adopting every future federal case that expanded or restricted those holdings.

Although the concepts of comity and federalism have no place in interpreting MCR 6.508, that rule shares at least one goal in common with habeas corpus review: finality of judgments. Consequently, I believe that the Court should embrace the very reasonable approach adopted in *Gray v Greer,* 800 F2d 644 (CA 7, 1985), because it protects both the state's interest in finality of judgments and the defendant's interest in the effective assistance of appellate counsel.

In *Greer,* petitioner Gray sought habeas corpus relief on the basis of ineffective assistance of appellate counsel, essentially the claim defendant Reed makes in the case at bar. In resolving the petitioner's claim, that court held:

> Were it legitimate to dismiss a claim of ineffective assistance of counsel on appeal solely because we found it improper to review appellate counsel's choice of issues, the right to effective assistance of counsel on appeal would be worthless. When a claim of ineffective assistance of counsel is based on failure to raise viable issues, the district court must examine the trial court record to determine whether appellate counsel failed to present *significant* and *obvious* issues on appeal. Significant issues which could have been raised should then

be compared to those which were raised. Generally, only when ignored issues are *clearly* stronger than those presented, will the presumption of effective assistance of counsel be overcome.

\* \* \*

A reviewing court can evaluate appellate counsel's choice of issues on appeal by examining the trial record and the appellate brief. While it is true that decisions which were arguably correct at the time will not be "second-guessed," a reviewing court must initially determine whether such decisions were, in fact, strategic. [*Id.* at 646. Emphasis added.]

Under *Greer,* therefore, only those issues that are both significant and obvious can be a basis of relief. Any such issues must be presented in defendant's brief, and citation of the record must be included. *Greer* also incorporates a respect for the strategic decisions of counsel if such discretion was actually exercised.

II

Finally, I also wish to point out that this Court need not even reach the issue whether defendant has shown good cause because it is evident that he has not suffered actual prejudice. As observed in *Strickland v Washington,* 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984), and implicitly adopted by this Court in *People v Pickens,* 446 Mich 298; 521 NW2d 797 (1994), a defendant must show both good cause and prejudice to substantiate a claim of ineffective assistance of counsel. But,

a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of

lack of sufficient prejudice, which we expect will often be so, that course should be followed. [*Strickland,* 466 US 697.]

Therefore, if it is clear that there is no actual prejudice, then there is no need to determine whether good cause has been shown. A defendant needs to prove both—thus a failure to meet one dooms relief. "Actual prejudice" is defined by MCR 6.508(D)(3)(b)(i) to mean that the defendant must show a reasonably likely chance of acquittal if not for the alleged error.* In light of the overwhelming evidence of defendant's guilt, the errors asserted would not have altered the verdict of guilty. Because the defendant cannot show actual prejudice, it is unnecessary to determine whether he can show good cause. His conviction should be affirmed and this appeal dismissed.

MALLETT, J., concurs with CAVANAGH, J.

LEVIN, J. I concur in part I of Justice CAVANAGH's opinion.

LEVIN, J. (*dissenting*). Following affirmance by the Court of Appeals of his convictions of first-degree murder, assault with intent to murder, attempted armed robbery and possession of a firearm during the commission of a felony,[1] defendant Albert Reed filed a motion for postappeal relief from judgment. MCR 6.508.[2] The judge who heard

---

* Of course, MCR 6.508(D)(3)(b)(ii), (iii), and (iv) provide other definitions.

[1] Unpublished opinion per curiam, issued September 13, 1984 (Docket No. 74583).

[2] MCR 6.500 *et seq.* provides for review of judgments in criminal cases no longer subject to direct appeal to the Court of Appeals or this Court. MCR 6.508(D) provides that the "defendant has the burden of establishing entitlement to the relief requested," and that the court may not grant relief to the defendant if the motion alleges grounds

the motion found that Reed's trial lawyer had
been ineffective in failing to object to or request
curative instructions for prosecutorial misconduct,
that Reed's first appellate lawyer had been ineffec-
tive in failing to raise those issues on direct ap-
peal, and that those errors constituted a "miscar-
riage of justice." The judge granted Reed's motion
for relief from judgment.

A divided panel of the Court of Appeals re-
versed,[3] holding that the judge erred in finding
that Reed had shown good cause, as required by
MCR 6.508(D)(3)(a), on the basis of the failure of
his first appellate lawyer to raise issues on Reed's
first appeal. The Court of Appeals did not consider
on the merits the allegations of prosecutorial mis-
conduct or the allegations or finding by the judge

for relief which were decided against the defendant in a prior appeal
unless there has been a retroactive change in the law, and that the
"court may not grant relief to the defendant if the motion"

(3) alleges grounds for relief, other than jurisdictional de-
fects, which could have been raised on appeal from the convic-
tion and sentence or in a prior motion under this subchapter,
unless the defendant demonstrates

(a) good cause for failure to raise such grounds on appeal or
in the prior motion, and

(b) actual prejudice from the alleged irregularities that sup-
port the claim for relief. As used in this subrule, "actual
prejudice" means that,

(i) in a conviction following a trial, but for the alleged error,
the defendant would have had a reasonably likely chance of
acquittal;

* * *

(iii) in any case, the irregularity was so offensive to the
maintenance of a sound judicial process that the conviction
should not be allowed to stand regardless of its effect on the
outcome of the case;

* * *

The court may waive the "good cause" requirement of sub-
rule (D)(3)(a) if it concludes that there is a significant possibility
that the defendant is innocent of the crime.

[3] 198 Mich App 639; 499 NW2d 441 (1993).

that the trial lawyer was ineffective. Nor did it consider whether Reed had shown "actual prejudice" as required by MCR 6.508(D)(3)(b).

This Court granted leave to appeal "limited to whether defendant has shown cause and prejudice as is required by MCR 6.508(D)(3)."[4] I would find that Reed showed good cause for failing to raise issues on the first appeal. Unless the first appellate lawyer is Groucho Marx, his own ineffectiveness is not an issue that will be raised by him on direct appeal.

Because the Court of Appeals did not consider the allegations or findings of prosecutorial misconduct and trial lawyer ineffectiveness, and did not consider whether Reed showed actual prejudice, I would not and do not address those issues. This Court should not bypass the trial court and Court of Appeals by resolving issues not addressed by those courts. Because the judge's findings on the actual prejudice issue are inadequate, this Court should remand to the trial court for further consideration.

I

Reed's convictions stemmed from his role in what had apparently been a botched robbery attempt that took place at the Traffic Light Lounge in the City of Detroit on March 24, 1982. Reed and a codefendant, Keith Sharp—who had been tried before Reed and found guilty, but not of murder—had been driven to the lounge by a friend of Sharp's, who saw that both were armed when they entered his automobile.

After he and Reed had been in the lounge for awhile, Sharp went over to the bar. His demeanor disturbed one of the bartenders, who went to the back room to inform her boss, the decedent bar

---

[4] 445 Mich 882 (1994).

owner, Lee Griffin, that a patron was causing a
disturbance. Sharp went to the back room, where
he was met at the swinging doors by Johnny Ray
Moore, a friend of Griffin's, who had been with
him in the back room. Sharp announced a robbery
and began shooting. He and Moore struggled for
Sharp's gun, a nine millimeter semiautomatic
handgun. Moore was shot once in the chest. Their
struggle led them to the bar area.

Griffin followed Moore out of the back room.
When Moore appeared to have Sharp subdued,
Sharp yelled for help. Griffin asked Moore to give
him Sharp's gun and to let Sharp up. Moore
testified that as he turned to hand Sharp's gun to
Griffin, he heard three or four more shots, from a
different gun, coming from behind him. He looked
to see Reed standing over him, shooting at him.
Reed shot Moore once in the arm and once in the
chest. Griffin slumped over on Moore. Sharp got
up, stepped on Moore's chest, retrieved the nine
millimeter handgun, and he and Reed left the bar.

No witness other than Moore saw Reed shoot a
gun. Numerous nine millimeter casings and slugs
were found in the bar, and one .38 caliber casing
was found near the pool table. Reed had been
standing near the pool table, according to Moore,
and had been armed with a .38 caliber handgun
according to the person who had driven Reed and
Sharp to the bar. No slugs were recovered from
Griffin's body or from Moore, with the result that
there is no evidence that any of the recovered
casings or slugs matched either of the weapons.

Griffin died of his wounds. Moore was hospital-
ized with his injuries for five days, and still carries
one of the bullets that entered his chest.

## II

The judge found that the prosecutor committed

misconduct that denied Reed a fair trial.[5] Reed's
trial lawyer had failed to object, and failed to ask
for curative instructions.[6] Reed's first appellate
lawyer had failed to raise the issues of prosecuto-
rial misconduct and ineffectiveness of the trial
lawyer on direct appeal, on which the judge based
her conclusion that the first appellate lawyer had
not acted as reasonably competent counsel. Those
errors, she said, "were serious enough to constitute
a miscarriage of justice and should have been
raised by appellate counsel despite trial counsel's
failure to object."

The Court of Appeals disagreed with the judge,
finding that Reed had not shown the good cause
that MCR 6.508(D)(3)(a) requires for failing to raise
issues that could have been raised on direct ap-
peal. The Court of Appeals reasoned that, for Reed
to show good cause for having failed to raise an
issue that could have been raised on direct appeal,
he had to show that his first appellate lawyer had
been ineffective. The Court had held that the
requirements of *Strickland v Washington,* 466 US
668, 689; 104 S Ct 2052; 80 L Ed 2d 674 (1984),[7]

---

[5] The judge found that the prosecutor had repeatedly misstated the
felony-murder rule, characterizing felony murder as a killing occur-
ring during the course of a felony. He had also misstated the law
regarding the specific intent required for a conviction of assault with
intent to kill—that the defendant must have intended to kill the
victim. Those errors had the effect of lessening the prosecution's
burden of proof. The judge also found that the prosecutor had used
the phrase "we know" during his closing argument to characterize an
important fact in dispute at the trial, thus putting the weight of the
prosecutor's office behind his argument.

[6] In the appeal of right, Reed's appointed appellate lawyer raised
two issues: (1) the instruction by the court on the felony-murder rule
had been overbroad and unclear in that it did not inform the jury
that it could not infer intent to kill from intent to commit the
underlying felony, and (2) introduction of evidence that Sharp had
been tried and, inferably, convicted in a prior proceeding for his role
in these events.

[7] To establish ineffective assistance of counsel, *Strickland* requires
that a defendant show that the lawyer committed errors that were so

would apply to claims of ineffective assistance of appellate counsel.[8]

Following *Jones v Barnes,* 463 US 745; 103 S Ct 3308; 77 L Ed 2d 987 (1983),[9] the Court of Appeals said that "appellate counsel's failure to raise every conceivable issue does not constitute ineffective assistance of counsel."[10] The Court added:

> Counsel must be allowed to exercise reasonable professional judgment in selecting those issues most promising for review. The fact that counsel failed to recognize or failed to raise a claim despite recognizing it does not per se constitute cause for relief from judgment.[11]

serious, under an objective standard of reasonableness, "that counsel was not functioning as an attorney as guaranteed under the Sixth Amendment. [T]he defendant must overcome the presumption that, under the circumstances, the challenged action also might be considered sound trial strategy." In addition, the error must prejudice the defendant.

[8] *People v Tommolino,* 187 Mich App 14, 17; 466 NW2d 315 (1991).

[9] The Court of Appeals said:

> The process of "winnowing out weaker arguments on appeal and focusing on" those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy. *Jones v Barnes, supra* at 751-752. [198 Mich App 648, n 8.]

*Jones v Barnes* relied on Stern, Appellate Practice in the United States (BNA, 1981), where, in § 7.22, p 283, it was observed:

> Perhaps criminal cases are an exception to the general rule. Defense counsel, including and perhaps particularly appointed counsel, deem it their obligation to raise *every possible contention,* in part to avoid being charged with not having fulfilled their duty to an indigent client. [Emphasis added.]

Although today's decision is the first interpretation by this Court of MCR 6.508(D), in the five years since it was adopted, there has not been a flood of orders granting relief from judgment pursuant to this rule.

[10] 198 Mich App 646.

[11] *Id.,* pp 646-647. The Court of Appeals continued:

*Jones v Barnes* is a federal habeas corpus case. The United States Supreme Court, in fashioning federal habeas corpus jurisprudence, is concerned with the principles of finality and comity. Since Michigan courts review only Michigan cases, we need not concern ourselves with comity.

The goal of promoting the finality of judgments is not served by encouraging appellate lawyers in criminal cases to outguess appellate benches by deciding which will be the winning issues that should be brought to the appellate court's attention, and ignoring other meritorious issues.

Finality of judgments[12] will best be promoted by holding appellate lawyers, whether retained or appointed, to standard 9 of the Minimum Standards for Indigent Criminal Appellate Defense Services, adopted by this Court in Administrative Order No. 1981-7, pursuant to MCL 780.712; MSA 28.1114(102). Standard 9 provides:

> Counsel should assert claims of error which are supported by facts of record, which will benefit the defendant if successful, which possess arguable legal merit, and which should be recognizable by a practitioner familiar with criminal law and procedure who engages in diligent legal research.

Often what an appellate lawyer thought would be his best issue will be ignored by the appellate

Thus, *to permit proper review in cases where appellate counsel has pursued an appeal as of right and raised nonfrivolous claims, the defendant must make a testimonial record in the trial court in connection with a claim of ineffective assistance of appellate counsel. People v Ginther,* 390 Mich 436, 443; 212 NW2d 922 (1973).

[12] While trial is the "main event," discretionary and direct appeal, and postconviction proceedings, including state and federal habeas corpus, have a well-established and historic role in the criminal justice system. See *Murray v Carrier,* 477 US 478, 516; 106 S Ct 2639; 91 L Ed 2d 397 (1986) (Brennan, J., dissenting).

court. Reversal may be granted on what the lawyer thought was a losing issue.

The majority of the Court of Appeals chides Reed for raising unpreserved issues in his motion for relief from judgment.[13] Neither of the issues raised in Reed's appeal of right had been preserved by objection.

Ineffective assistance is not merely a "conceivable" issue, but one that may sometimes be objectively determined from the trial record. Where ineffective assistance is clearly established on the record, there is no need for an evidentiary hearing.[14]

III

The Court of Appeals, having found that Reed failed to show "good cause" for filing a MCR 6.508 motion, declined to discuss the issues concerning Reed's trial that the judge discussed at some length and had found to be meritorious.

In the motion for relief from judgment, Reed's present lawyer raised five issues.[15] The judge found no merit in the first four issues,[16] but found merit

---

[13] 198 Mich App 647.

[14] In the instant case, the errors of the trial lawyer did not necessarily require an evidentiary hearing. The errors (see text preceding n 18) appear on the record.

[15] (1) The prosecutor argued facts not in evidence by exhibiting a photograph of Sharp, in which he appeared younger than Reed, thus implying that Reed was the ringleader and an experienced criminal; (2) the prosecutor argued facts not in evidence by stating in opening argument that shells matching Sharp's gun were found in the bar, when no such evidence was introduced at trial; (3) the prosecutor erred in placing Sharp's conviction before the jury; (4) the trial court gave improper instructions on the elements of assault with intent to murder; and (5) the trial lawyer and former appellate lawyer rendered ineffective assistance as guaranteed by the Sixth Amendment.

[16] Sharp appeared younger than Reed in a photograph displayed to the jury. The judge said that this would not, without other misconduct, "lead to an inference that the defendant was a bad man or experienced criminal," even if that had been, in fact, what the

in the fifth issue, claiming that the trial lawyer and first appellate lawyer had rendered ineffective assistance. An assessment of the claim that the first appellate lawyer had been ineffective thus required an assessment of the trial lawyer's performance.[17]

The trial lawyer failed to object to (1) the prosecutor's repeatedly erroneously defining felony murder as "a killing occurring during the course

prosecutor intended the jury to infer. Since there had been no other related misconduct at Reed's trial—nothing in the nature of his having a prior record, of which there is no evidence, or references to other illegal acts committed by Reed, of which there is no evidence—the prosecutor having said that Sharp may have made mistakes because he was the younger of the two did not deprive Reed of a fair trial.

The prosecutor's statement in opening argument that shells matching Sharp's gun were found in the bar when no such evidence was presented at trial did not deprive Reed of a fair trial. The evidence, presented by numerous witnesses, that Sharp had been present and that he had been shooting his gun, was overwhelming.

Sharp's conviction had been erroneously placed before the jury. Since this had been litigated on direct appeal, this issue was not appropriately before the judge in the motion for relief from judgment, and she properly noted that she could not grant relief on it.

The judge also disagreed with Reed's contention that the judge's instructions on the offense of assault with intent to commit murder were erroneous. The trial judge had instructed the jury that the requisite intent was intent to kill. There was no case law to support Reed's contention that the instruction on manslaughter but not second-degree murder could have led the jury to infer that it could convict Reed of assault with intent to commit murder if it found that his intent in shooting Moore was to commit great bodily harm or was done with wilful and wanton disregard of the likelihood that death or great bodily harm would occur.

[17] In *Murray v Carrier*, n 12 *supra*, p 483, Carrier had abandoned any claim of ineffective assistance of counsel. In the instant case, an issue is whether there was effective assistance of counsel. The United States Supreme Court said: "So long as a defendant is represented by counsel whose performance is *not constitutionally ineffective* under the standard established in *Strickland v Washington* [466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984)], we discern no inequity in requiring him to bear the risk of attorney error that results in a procedural default" under state law. *Murray v Carrier, supra,* p 488. (Emphasis added.)

*Murray v Carrier* does not circumscribe this Court's authority to decide what constitutes procedural default under Michigan law and procedure.

of a robbery," (2) the prosecutor's repeated use of the phrase "we know" as a preface to comments made during closing arguments, "which the defense asserts injected the prosecutor or his office in the fact-finding process," and (3) the prosecutor's use of "not caring" as the mental state required for the crime of assault with intent to murder.

The judge said that she was following the two-pronged test set forth in *Strickland v Washington* in measuring the effectiveness of the trial lawyer.

The prosecutor misstated the felony-murder rule stated by this Court[18] by characterizing felony murder as a killing occurring during the course of an enumerated felony under the felony-murder statute.[19] The judge said that there was no advantage to the defense in failing to object to a statement of the law that would lessen the prosecutor's burden of proof on the felony-murder charge and increase the likelihood of conviction.

The judge similarly so found regarding the prosecutor's repeated use of "not caring" as the mental state required for assault with intent to murder—as distinguished from actual intent to kill—and the trial lawyer's failure to object to that misstatement. The erroneous statement similarly lessened the prosecutor's burden of proof and increased the likelihood of conviction.[20]

[18] *People v Aaron,* 409 Mich 672; 299 NW2d 304 (1980).

[19] *Aaron* requires that the prosecutor show malice in connection with the killing, in addition to the mental state necessary to commit the underlying felony. After *Aaron,* "felony murder" in Michigan is murder committed as a direct result of the commission or attempt to commit a felony, with one of the recognized forms of malice (intent to kill, intent to cause great bodily harm, or wanton and wilful disregard of the likelihood that the natural tendency of one's acts will cause death or great bodily harm), not a killing that occurred during the course of a felony.

[20] In *People v Taylor,* 422 Mich 554, 567; 375 NW2d 1 (1985), this Court held that the mental state required to convict of assault with intent to murder was actual intent to kill. No lesser intent provides the requisite mental state.

The judge found that the prosecutor's repeated use of the preface "we know" during his closing argument "does not necessarily constitute misconduct or reflect that the prosecutor vouched for the guilt of the defendant." It could have been a shortened way of saying "we all (jury and prosecutor) heard the testimony" given in court. The judge added that "the prosecutor's remarks must be evaluated in light of the relationship they bear to the evidence admitted at trial."[21] Where such a preface was employed in recounting issues of fact not in controversy, there was no error.

The judge found error where the prosecutor used "we know" to preface a fact in dispute—the identity of the person who fired the fatal shot—to which the trial lawyer failed to object. The fatal shot was not recovered from the decedent's body, and the caliber of the fatal bullet was never determined. Since the evidence showed that Reed had used a .38 caliber handgun, and that Sharp had used a nine millimeter semiautomatic handgun, there was no consensus concerning the gun that fired the fatal shot.

While Moore testified that Reed had shot both him and the decedent, two other witnesses testified that they saw Sharp struggling with Moore as shots rang out, not Reed. Other witnesses neither saw the shootings nor identified the shooters. The judge concluded that the use of "we know" to preface what she characterized as "*the* central issue in controversy" (the identity of the decedent's shooter), where "the evidence [on that issue] conflicted," could not "be said to be an innocent, fair summation of the testimony." Such a preface appeared to the judge to "have lead the jury (who were the *only* fact finders) to 'suspend its own

---

[21] The judge cited *People v Cowell,* 44 Mich App 623, 627; 205 NW2d 600 (1973).

powers of critical analysis and judgment in deference to those of the prosecutor.' ''[22]

Because the Court of Appeals did not assess the judge's decision that the trial lawyer was ineffective, this Court should not address or rule on that issue.[23]

---

[22] The judge cited *People v Humphreys,* 24 Mich App 411, 418; 180 NW2d 328 (1970).

The judge's characterization of the identity of the shooter of the fatal shot as the central issue in the trial might not be correct because Reed may have been subject to liability as an aider or abetter.

[23] The prosecutor argues that the prosecutor did not commit misconduct at Reed's trial, and Reed therefore was not prejudiced by any failure to object to statements made by the prosecutor during closing argument.

The prosecutor argues that all the instances of alleged prosecutorial misconduct in the form of misstatements of the law and prosecutorial vouching did not constitute misconduct when the statements are viewed in the context of the prosecutor's entire closing argument.

The prosecutor argues that the prosecutor's use of "we know" as a preface to many of his remarks during closing argument was not an instance of vouching where there was evidence to support his arguments. He disagrees with the judge's characterization of the identity of the shooter as the central issue in controversy, because Moore's testimony on that issue was undisputed—no other witness contradicted that statement, and most were not in a position to see who was shooting whom.

The prosecutor, when using "not caring" as a proper mental state for murder when recounting the felony-murder rule, was describing the third form of malice attendant to murder, that of wilful and wanton disregard of the natural likelihood that one's actions would cause death or great bodily harm.

The prosecutor posits that, when viewed in its entirety, the prosecutor's definition of the malice requisite to a finding of murder was adequate. Also, the judge gave proper instructions on the felony-murder rule.

Finally, the prosecutor argues that the prosecutor's statement of the elements of the crime of assault with intent to murder, while erroneous, was cured by the instructions given by the judge. The prosecutor argues that the law at that time was in a state of flux with regard to the mental state requisite to a finding of assault with intent to murder, and notes that *People v Taylor* would not be decided until two years after the prosecutor made his closing argument at Reed's trial.

Reed maintains that the judge correctly assessed the effect of the prosecutorial errors in his closing argument—that they lessened the prosecution's burden of proof, and that there was no sound trial strategy for the trial lawyer having failed to object or request curative instructions.

IV

The judge said that the prosecutor's misstatements denied Reed due process, and his trial lawyer's failure to object or request curative instructions meant that he did not perform "as a reasonably competent attorney or as counsel guaranteed by the Sixth Amendment." She further stated that the appellate lawyer's failure to raise prosecutorial errors and trial lawyer ineffectiveness constituted failure of the first appellate lawyer to act as a reasonably competent lawyer. Those errors, she said, "were serious enough to constitute a miscarriage of justice and should have been raised by appellate counsel despite trial counsel's failure to object."

Relief from judgment may be granted only when the defendant shows that he suffered "actual prejudice from the alleged irregularities that support the claim for relief." " '[A]ctual prejudice' means that . . . in a conviction following a trial, but for the alleged error, the defendant would have had a reasonably likely chance of acquittal, MCR 6.508(D)(3)(b)(i), or, "in any case, the irregularity was so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand regardless of its effect on the outcome of the case . . . ." MCR 6.508(D)(3)(b)(iii).

The judge may have found prejudice under MCR 6.508(D)(3)(b)(iii), in that she characterized the errors as "serious enough to constitute a miscarriage of justice" without regard for their effect on the outcome of the trial.

The majority of the Court of Appeals, having found that failure to raise certain alleged improprieties on direct appeal did not constitute "good cause" under MCR 6.508(D)(3)(a), did not rule on

whether the alleged errors caused Reed actual prejudice.

Reed argues that he showed actual prejudice under both subsections (i) and (iii). He argues that the evidence against him was not overwhelming, and that the prosecutorial errors asserted—the prosecutor having misstated the law and having repeatedly vouched for his case—are the type that lead a jury to suspend its own powers of analysis in deference to those of the prosecutor. Further evidence of actual prejudice is the judge's finding that some of the errors were serious enough to have caused a miscarriage of justice under subsection (iii).

The prosecutor argues that there was neither good cause for failing to raise particular issues on direct appeal nor actual prejudice suffered by Reed.

The judge referred to neither of the MCR 6.508(D)(3)(b) definitions of actual prejudice (subsections [i] and [iii]) in granting Reed's motion. The Court of Appeals did not address the actual prejudice issue.

This Court should vacate the decision of the Court of Appeals and remand to the trial court for further exposition on the actual prejudice issue.

WEAVER, J., took no part in the decision of this case.