*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ASHLEY ELEANOR PERETIATKO,

        Defendant-Appellant.

UNPUBLISHED
March 14, 2019

No. 342523
Grand Traverse Circuit Court
LC No. 16-012565-FC

Before: SAWYER, P.J., and CAVANAGH and K. F. KELLY, JJ.

PER CURIAM.

Defendant pleaded guilty to assault with intent to commit murder ("AWIM"), MCL 750.83, and aiding and abetting second-degree home invasion, MCL 750.110a(3). She was sentenced to serve a term of 20 to 40 years' imprisonment for her conviction of AWIM and a concurrent term of 10 to 15 years' imprisonment for her conviction of second-degree home invasion. Defendant appeals by delayed leave granted,[1] claiming that there was an insufficient factual basis to support her plea for second-degree home invasion and that her former appellate attorney provided constitutionally ineffective assistance of counsel by failing to timely move to withdraw her guilty plea on that basis.[2] Because there was, in fact, a factual basis to support defendant's plea we affirm.

## I. BASIC FACTS

Defendant's convictions stem from her attempt to kill her parents, Jim ("Jim") and Amy ("Amy") Barron. Defendant's husband, David Peretiatko ("David"), had threatened to kill Jim and Amy for years.

---

[1] *People v Peretiatko*, unpublished order of the Court of Appeals, entered April 9, 2018 (Docket No. 342523).

[2] Defendant does not challenge her AWIM conviction.

In October 2016, Jim and Amy resided with defendant and David's two children in Traverse City, along with their 20-year-old son. Jim and Amy were the children's guardians. Defendant called Jim and told him that David had stranded her in Las Vegas and that she was prostituting herself. She threatened to commit suicide. Defendant convinced Jim to pay for her to fly to Michigan while David allegedly remained in Las Vegas.

At the preliminary examination, David explained that when he picked up defendant from the airport "[i]t was the first time I saw her in three years and eight months." Because Jim and Amy were apprehensive about letting defendant stay in their home, they initially paid for her to stay at a hotel. David testified:

> *Q.* Now, when you –at some point you allowed her into your home; is that correct?
>
> *A.* Yes. I didn't want to, but I have a heart.
>
> *Q.* Am I correct, you had some kind of a contract written up with her about what she could do and couldn't do?
>
> *A.* We asked her to look over a contract for if she was going to stay with us, to let her know that it is temporary, that she was not a resident here and that it's a day-to-day basis. And that she is to have no contact with – the kids were to have no contact with David, and no phone calls, and that he's not allowed in the house, that I'm helping her and her alone, that I'm not doing this for him. I was helping her out. And I was actively looking for either shelters or rooms for rent for her to live in. In the meantime I was providing her to stay there for those few days.
>
> * * *
>
> *Q.* Did you actually have her sign a contract that spelled out certain terms of conduct that she was to follow if she was going to remain in the house?
>
> *A.* Yes, I did. Because I wanted her to know that she's just a guest in this house –
>
> *Q.* Sure.
>
> *A.* – on a day-by-day basis, and we had expectations of her while we were trying to help her.

Defendant spent the first couple of days in a hotel and, when the attempted murder occurred, defendant had been in the home for only seven non-consecutive days. Jim testified about his continued search for somewhere defendant could stay: "at first I put her up in a hotel room for a couple days when she arrived while I was trying to find shelter for her and other places to live, because I didn't want her living in my house." Jim had "serious concerns" about defendant staying with them because of "a continual threat to us over years and years. Ever since she's been with her husband [David], both him threatening and her reinforcing that, that

threat was real." In fact, Jim had a Personal Protection Order against David in the past, but had let it lapse.

Jim testified that defendant was well aware of the fact that David was not permitted in the home:

> *Q.* Have you told David or Ashley Peretiatko in the past that David was not allowed in your home?
>
> *A.* Besides it being on the Personal Protection Order that he was given via mail, he was told. Both of them knew that he wasn't wanted here. They – at one point when we were living in Livonia they both wanted to move into our house and live in our basement, which was a finished basement and basically live there until they got on their feet, and I would not allow it. And that made both Ashley and David upset that I wouldn't let them live with us. But I knew that it was not – that it would be a toxic situation.
>
> *Q.* Have you ever allowed David Peretiatko in your home in Traverse City?
>
> *A.* Never.
>
> *Q.* Would you allow him into your home?
>
> *A.* Never.

Again, Jim stressed to defendant that he was helping her, not David. Jim told defendant: "I can't stop David from coming and living with you in that [hotel] room, but he's not going to come here right now."

On the first or second day that defendant was in the home, she finally confessed to Jim that she was in Michigan "as a peacekeeper" and that she and David intended to retrieve the children. When Jim told defendant that was not going to happen, defendant "basically said that they are going to get the kids and whatever means necessary to get them, but they wanted to solve it peacefully." Defendant told Jim that one of her suitcases actually belonged to David and that she had brought some of his things with her. At that point, Jim "knew for sure that, yes, [defendant and David] are in contact, and, yes, he's coming." Jim "immediately made [defendant] leave the house" and took her to a motel for a night while he tried to "figure out what to do with her. It still came down to I didn't want her living in my house." He testified:

> *Q.* You would agree with me that at least for that time period, approximately seven days, that she was in your home with your permission and consent?
>
> *A.* Permission as long as she followed the rules of the contract.
>
> *Q.* And you never asked her to leave?

*A*. I asked her to leave that one night I took her to the hotel over by East Bay because of – I was upset with her saying how they are going to take the kids, and I needed to regroup my thoughts and have her not be there.

*Q*. And then did you let her back in the next day?

*A*. I let her back in.

Jim was not prepared to have defendant walk the streets. Jim also believed that "if I let her out then I can't keep an eye on her to know what she's doing. And I thought if she's [at the house] I can maybe have a better idea of what's going on, maybe try to deter him from coming."

On October 14, 2016, defendant had been with Jim and Amy for seven non-consecutive days. At approximately 5:00 or 6:00 p.m., someone from the Las Vegas Police Department called Jim and informed him that David had an arrest warrant for killing a man and stealing the man's car. David had used his cell phone in Illinois and was traveling to Michigan in the stolen vehicle. Jim testified that Amy "started making phone calls to see if we could spend the night in a hotel, but something was going on in town" and there were no vacancies. Additionally, Jim did not want to alert defendant that he knew "something was happening."

Jim, a retired police officer, kept himself armed with a .38 caliber revolver. Jim talked to neighbors about what was happening. He also contacted the Grand Traverse Sheriff's Department because he was concerned about David coming to Michigan. He told a deputy that if David "showed up that there was going to be people dead. And it would either be me or him or both of us, or my whole family. And the next time that the deputy came out . . . it would be too late to help me." Jim felt his fears were well-founded because defendant told him that "David felt it was important that my son Shane and my daughter Courtney were also taken out, not just us, but also them killed because I took their two kids. So they wanted to take my two kids to be fair."

Shortly before 10:30 p.m., Jim, armed with his revolver, went downstairs to turn on an outside light because he was concerned about David coming to his home. Jim heard the shower running, but saw defendant standing near the door of the bathroom. David then came out of the bathroom and pointed a gun at Jim's face. Jim drew his pistol and shot David, using all five rounds. David was struck three times and ultimately died from his wounds. Jim yelled to Amy to call 911 and ran upstairs. Unsure whether defendant posed a threat, Jim armed himself with a second gun, knowing that the first gun was empty. He looked out his bedroom door and saw defendant crouched on the stairs, holding David's gun. She began creeping up the stairs and pointed the gun at Jim. Jim fired one shot, which struck defendant and caused nonfatal injuries.

Jim testified that he did not let David into the house – "Never. It was never a possibility."

The prosecutor charged defendant with first-degree murder, AWIM, first-degree home invasion, assault with a dangerous weapon, felony-firearm, and kidnapping. Defendant pleaded guilty to AWIM and first-degree home invasion in exchange for the dismissal of the remaining charges. Defendant tendered her guilty plea on May 26, 2017. Part of the factual basis for defendant's plea was as follows:

-4-

Ashley, on the date the Court has asked you about, October 14th of 2016, were you living at your parents' home at 5198 Jacks Trail in Traverse City?

*Defendant Peretiatko*: Yes, sir.

*Mr. Jarboe*: And, you were there with their consent and permission, is that correct?

*Defendant Peretiatko*: Yes, sir.

*Mr. Jarboe*: And, on that day, did your husband, David Peretiatko, come to the home?

*Defendant Peretiatko*: Yes, sir.

*Mr. Jarboe*: And, did you allow him to enter the home without your parents' permission?

*Defendant Peretiatko*: Yes, sir.

On June 19, 2017, the court received a letter from defendant asking for a new attorney and to withdraw her plea. On June 26, 2017, the court received another letter from defendant stating that she wished to withdraw her request to withdraw her guilty plea.[3]

Defendant was sentenced on July 7, 2017, at which time the parties agreed that, in order to avoid consecutive sentencing, defendant would stand convicted of second-degree, instead of first-degree, home invasion. She was sentenced to serve a term of 20 to 40 years' imprisonment for her conviction of AWIM and a concurrent term of 10 to 15 years' imprisonment for her conviction of second-degree home invasion.

Defendant timely requested appointed counsel, and the court appointed Suzanna Kostovski to represent defendant during appellate proceedings. On January 9, 2018, Kostovski moved to withdraw on the basis that defendant insisted on pursuing a withdrawal of her plea to second-degree home invasion and that this insistence was not in defendant's best interests. On January 10, 2018, the court granted the motion. On January 12, 2018, the court appointed current appellate counsel.

On February 22, 2018, defendant, through counsel, filed a delayed application for leave to appeal, arguing that she should be permitted to withdraw her home invasion plea because there did not exist a sufficient factual basis for the plea. She contends that she did not raise that argument in a motion to withdraw her plea in the trial court due to ineffective assistance of counsel. She further argues that, pursuant to *People v Broyles*, 498 Mich 927; 871 NW2d 209

---

[3] Defendant claims that her attorney pressured her to revoke her request to withdraw her plea.

(2015), this Court may consider the plea withdrawal issue in the context of an ineffective assistance of counsel claim despite her failure to previously raise the issue in the trial court.

While we agree that *Broyles* permits defendant to raise an ineffective assistance of counsel claim in this type of situation, defendant's claim fails as a matter of law because there was a factual basis for her home invasion plea; consequently, counsel could not have rendered ineffective assistance of counsel in failing to file a motion to withdraw the plea on that basis.

## II. ANALYSIS

On appeal, defendant argues that counsel was ineffective in both a substantive and procedural way. She writes:

> [A]s a substantive matter defendant argues that former appellate counsel was ineffective for not recognizing that she had a complete defense to the charge of home invasion. As a procedural matter, former appellate counsel's ineffectiveness is relevant to the loss of an appeal of right and the failure to advise defendant that she had a strong basis to appeal.

We disagree.

A defendant's right to effective assistance of counsel extends to the effective assistance of counsel on appeal. *Evitts v Lucey*, 469 US 387, 396; 105 S Ct 830; 83 L Ed 2d 821 (1985); *People v Campbell*, 499 Mich 896; 499 NW2d 896 (2016). To show ineffective assistance of appellate counsel, a defendant must demonstrate that counsel provided deficient performance under an objective standard of reasonableness and that this deficient performance prejudiced the defendant. *Roe v Flores-Ortega*, 528 US 470, 476-477; 120 S Ct 1029; 145 L Ed 2d 985 (2000); *People v Uphaus (On Remand)*, 278 Mich App 174, 186; 748 NW2d 899 (2008). "An appellate attorney's failure to raise an issue may result in counsel's performance falling below an objective standard of reasonableness if the error is sufficiently egregious and prejudicial." *People v Reed*, 198 Mich App 639, 646; 499 NW2d 441 (1993), aff'd 449 Mich 375 (1995).

When a defendant fails to move to withdraw a plea within six months after sentencing, "the defendant may seek relief only in accordance with the procedure set forth in subchapter 6.500." MCR 6.310(C)(3). Under MCR 6.508(D), a "defendant has the burden of establishing entitlement to the relief requested." When a defendant raises a challenge that "could have been raised on appeal from the conviction or sentence or in a prior motion," this Court may not grant relief "unless the defendant demonstrates (a) good cause for failure to raise such grounds on appeal or in the prior motion, and (b) actual prejudice from the alleged irregularities that support the claim for relief." MCR 6.508(D)(3).

"When ineffective assistance of counsel, based on a failure to raise viable issues, is the justification for excusing procedural default, the movant must establish ineffective assistance of counsel pursuant to the standard set forth in *Strickland v Washington*, [466 US 668; 104 S Ct 2052; 80 L Ed 674 (1984)], or that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *People v Reed*, 449 Mich 375, 382; 535 NW2d 496 (1995) (opinion by BOYLE, J.), aff'g 198 Mich App 639 (1993) (quotation marks and citation omitted). Further, a defendant can establish "actual prejudice" resulting from

a plea-based conviction only if she can show that a "defect in the proceedings was such that it rendere[d] the plea an involuntary one to a degree that would be manifestly unjust to allow the conviction to stand," MCR 6.508(D)(3)(b)(*ii*), and that "the irregularity was so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand regardless of its effect on the outcome of the case," MCR 6.508(D)(3)(b)(*iii*). Alternatively, "[t]he court may waive the 'good cause' requirement . . . if it concludes that there is a significant possibility that the defendant is innocent of the crime." MCR 6.508(D).

Here, defendant contends that she could not be convicted of aiding and abetting home invasion because David had defendant's permission to enter her parents' home. In effect, she argues that, as an occupant of the home, she gave David permission to enter. If David had permission to enter, then he was not guilty of home invasion and, consequently, defendant could not be guilty of home invasion as an aider and abettor.

The aiding and abetting statute provides that "[e]very person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense." MCL 767.39. There are three necessary elements the prosecution must prove to convict a defendant of aiding and abetting the commission of an underlying crime:

> (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement. [*People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999) 757 (quotation marks and citation omitted).]

MCL 750.110a(3) provides:

> (3) A person who breaks and enters a dwelling with intent to commit a felony, larceny, or assault in the dwelling, a person who enters a dwelling without permission with intent to commit a felony, larceny, or assault in the dwelling, or a person who breaks and enters a dwelling or enters a dwelling without permission and, at any time while he or she is entering, present in, or exiting the dwelling, commits a felony, larceny, or assault is guilty of home invasion in the second degree.

The issue, then, is whether David had permission to enter the home.

Defendant cites *People v Rider*, 411 Mich 496, 497, 499-500; 307 NW2d 690 (1981) and *People v Brownfield (After Remand)*, 216 Mich App 429, 430-432; 548 NW2d 248 (1996) in support of her position. Both cases are unavailing.

In *People v Rider*, our Supreme Court found insufficient evidence to support a plea-based conviction of breaking and entering where an employee used a key provided by his employer to enter his workplace after hours. The record did not demonstrate whether his employer placed any restrictions on his use of the key, but the Court held that his conviction would stand if the

prosecutor could prove that his use of the key violated his employer's restrictions. *Rider*, 411 Mich at 500. Here, defendant's conduct was in clear violation of restrictions her father placed on her staying in the home, namely the contract that she signed agreeing not to let David into the house. If anything, *Rider* directly contradicts defendant's position.

In *People v Brownfield*, the defendant and two friends, Eddie Previch and Dwain Nutt, went to the house of Nutt's stepfather, with whom Nutt lived, intending to steal items from the house. *Brownfield*, 216 Mich App at 430-431. On this basis, the defendant pleaded guilty to aiding and abetting breaking and entering an occupied dwelling with intent to commit larceny. *Id*. at 430, 432. When the trial court denied defendant's motion to withdraw his plea, it "stated that Nutt had been restricted from entering the home for the purpose of stealing. Thus, . . . Nutt did not have permission to enter and, when defendant [Brownfield] went through the door, he committed a breaking with the intent to commit an unlawful purpose." *Id*. at 431. At a hearing on remand, "Nutt testified that . . . he had the authority to enter the home, but his stepfather did not give him the authority to enter the home to steal property; [Nutt] added that he had permission to bring friends to the house." *Id*. at 430-431. This Court held that there were insufficient facts to support the defendant's plea to aiding and abetting breaking and entering, concluding that "[b]ecause Nutt had the right to enter the home, he did not commit a breaking and entering," and "[b]ecause Nutt had the right to enter, defendant [Brownfield] did not commit a breaking and entering under an aiding and abetting theory." *Id*. at 432. Further, this Court noted that even though Nutt was not permitted to enter his stepfather's house to steal property, "[e]ntry . . . is an element separate and apart from the element of intent . . . . " *Id*. at 431-432. Again, *Brownfield* is not helpful to defendant's case. As clearly set forth above, David had no permission to enter the home.

A case more on point is *People v Dunigan*, 299 Mich App 579; 831 NW2d 243 (2013). In *Dunigan*, this Court rejected the defendant's argument that he could not be convicted of home invasion of his girlfriend's home because he had a right to be there and had stayed there with her permission in the past. Specifically, this Court concluded that "[t]he record overwhelmingly show[ed] . . . that defendant had no right to be in the house at the time of the invasion," where "his girlfriend had affirmatively refused his repeated requests for a key, a garage door opener, and alarm access codes for the house." *Id*. This case is similar in that the surrounding facts and circumstances demonstrate that David had no right to be in the house. Jim testified that he had never and would never allow David into his house and that he previously had a Personal Protection Order against David. Jim conditioned defendant's ability to stay in the house on her agreement not to allow David to have any contact with her children, and she signed a contract agreeing not to let him into the home.

Defendant cannot rely on her alleged right to be in the home, which disappeared upon her violating the conditions of her being allowed in the home. Having failed to comply with her parents' rules, defendant no longer possessed a right to be in the home. She was, at most, a visitor, having been in the house for seven non-consecutive days before the attempted murders. Defendant was expressly prohibited from permitting David to enter the home. David clearly understood that he lacked permission to enter the home. They then conspired to commit a felony therein. Moreover, defendant specifically admitted at her plea hearing that she "allowed [her] husband . . . into [her] parents['] home without [her] parents['] permission knowing that he had a

firearm and that he had a felony firearm and that was against the law[.]" There was clearly a factual basis for defendant's plea.

Given the number of other charges that defendant would face if she withdrew her plea, as well as the possibility of a mandatory life sentence for her charge of conspiracy to commit first-degree murder, defendant is unable to overcome the presumption that appellate counsel's advice that defendant should not withdraw her plea was sound appellate strategy. Instead of a mandatory life sentence, defendant's decision to plead guilty to second-degree home invasion led to her receiving a maximum sentence on that charge of 15 years. Counsel's advice was within the range of competence demanded of an appellate attorney.

Affirmed.

/s/ David H. Sawyer
/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly