*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

UNPUBLISHED
August 6, 2020

v

No. 346321
Calhoun Circuit Court
LC No. 2002-003157-FC

TONIA JOYCE MILLER,

Defendant-Appellant.

Before: GADOLA, P.J., and GLEICHER and STEPHENS, JJ.

PER CURIAM.

Seventeen years ago, a jury convicted Tonia Miller of second-degree murder arising from the death of her 11-week-old daughter, Alicia Duff. The prosecution contended that Miller murdered Alicia by violently shaking her. Alicia's autopsy revealed a trio of findings routinely attributed to a singular and distinct cause: shaken baby syndrome (SBS), also called abusive head trauma (AHT).

During the nearly two decades since Miller's conviction, the science underlying the diagnosis of SBS/AHT has evolved. Miller contends that in 2003, the "classic trio" findings of subdural blood, cerebral edema, and retinal hemorrhage, axiomatically evinced a violently and intentionally shaken child. She claims that recent scientific advancements have led to a wholesale reassessment of the assumptions that previously dominated SBS/AHT science. Her evidence includes expert reports attributing Alicia's death to pneumonia.

In the wake of the shift in scientific and medical opinion and the analyses conducted by her experts, Miller sought relief from judgement under MCR 6.500, contending that newly discovered evidence warranted a new trial. The trial court summarily rejected Miller's arguments, denied her the opportunity to present any evidence in support of her motion, and expressed formed opinions regarding Miller's guilt and the invalidity of her expert's views. We reverse and remand for an evidentiary hearing before a different judge and retain jurisdiction.

No one saw Miller shake Alicia, and Alicia had no external injuries or broken bones. Miller testified that as she was feeding Alicia formula from a bottle, Alicia began gasping for air and stopped breathing. The baby "arched backward" and formula came out of her nose, Miller recounted. Miller described that she shook the child "just enough to where she straightened [her] back out," agreeing with her counsel that her action was akin to "gentle prod[ding]" intended to get Alicia to react. Miller vehemently denied that she shook her child violently or with an intent to injure her.

Alicia remained nonresponsive and Miller called 911. The child was transported to a hospital in Battle Creek and transferred to Bronson Methodist Hospital. Radiologic studies revealed a subdural hematoma and cerebral edema, and an ophthalmologist noted retinal hemorrhages. Alicia's attending physicians rapidly diagnosed her as a victim of shaken baby syndrome. She died the next day.

Three physicians testified at Miller's trial. Dr. Robert Beck, a pediatric intensivist who cared for Alicia at Bronson, asserted that Alicia's subdural bleeding, cerebral edema, and her retinal hemorrhages met the "diagnostic criteria" for shaken baby syndrome, adding: "[t]here's really no other explanation typically found." The pathologist who performed the autopsy, Dr. Brian Hunter, opined that Alicia's cause of death was "abusive head injuries" manifested by a subdural hematoma, cerebral edema, and retinal hemorrhages.

Miller called her own expert witness, forensic pathologist Ljubisa Dragovic, M.D. Based on the presence of the classic triad of brain and eye findings, Dr. Dragovic agreed that Alicia's autopsy supported a diagnosis of abusive head trauma. Dr. Dragovic maintained that Alicia's brain injury was not "fresh," however, and likely had been sustained a week before she died.

The jury convicted Miller of second-degree murder, MCL 750.317, and this Court affirmed on direct appeal. *People v Miller*, unpublished per curiam opinion of the Court of Appeals, issued November 9, 2004 (Docket No. 249412).

II

In support of her motion for relief from judgment Miller presented the affidavits of four experts, all of whom concluded that Alicia died of a natural cause—fulminant pneumonia. The experts based their opinions on their review of Alicia's medical records, CT scans, chest x-rays, the autopsy report, and an examination of the pathology slides and remaining lung tissue.

One of the affiants, Dr. Janice Ophoven, described the evolution in medical and scientific thought regarding the diagnosis of SBS/AHT as follows:

> 19. At the time of trial, the presence of the triad of retinal hemorrhage, brain swelling and subdural hemorrhage was believed to represent a sure constellation of findings indicating injury from shaking. The belief in the triad as diagnostic of SBS is reflected in the testimony of Dr. Hunter, the forensic pathologist in this case. At the time of trial, Dr. Hunter's testimony was consistent with the predominant views in the forensic pathology community, as evidenced by a 2001 position paper of the

National Association of Medical Examiners (NAME). The 2001 NAME paper on SBS essentially endorsed the triad as diagnostic of SBS.

20. However, since the time of trial, scientific research has caused a significant shift in the forensic pathology community. Today, the triad is no longer widely accepted as diagnostic of SBS in the forensic pathology community. The 2001 NAME paper on SBS has been withdrawn, and more and more contributions to the biomechanical and neuropathology literature since the trial have led to a sea change in the interpretation of these cases.

Dr. Julie A. Mack, a board-certified radiologist, averred that Alicia's imaging confirmed pneumonia and that "scientific research published after the 2003 trial in this case strongly undermines the notion that the findings in this case are diagnostic of abusive injury." Dr. Mack found no evidence of trauma and expressed that Alicia had a preexisting illness. Dr. Francis H.Y. Green, a pathologist with extensive experience in lung disease, averred that the pathology evidence "confirmed very severe acute pneumonia in both lungs, consistent with a bacterial pneumonia. In some areas of the lung the acute pneumonia was necrotizing (forming abscesses), a process that takes more than 24 hours." Dr. Green noted that Alicia's blood cultures grew Staphylococcus hominis, "indicative of septicemia resulting from the pneumonia." Alicia's lungs also showed evidence of a preexisting mild viral infection, Dr. Green opined.

In addition to the four expert affidavits, Miller's motion for relief from judgment raised the following factual allegations:

7. Throughout her 11 weeks of life . . . [Alicia] frequently suffered episodes where she suddenly stopped breathing. These apneic episodes were witnessed by [defendant's] mother, sisters, neighbors, and acquaintances.

8. [Defendant] sought medical attention for her daughter's breathing problems, but was told that she was being a "paranoid parent." While [defendant] attempted to advocate on Alicia's behalf, the episodes continued.

* * *

10. Dr. Hunter, the doctor who performed the autopsy on Alicia, found evidence of a constellation of three symptoms known as the "triad." They include subdural hemorrhaging, retinal hemorrhaging, and swelling of the brain.

11. In his autopsy report, he stated that the evidence "strongly indicate[d]" that shaking caused Alicia's death.

* * *

13. Dr. Hunter's diagnosis aligned with the prevailing belief in the medical community at the time of [defendant's] trial in 2003. At that time, it was widely believed that the presence of the triad was diagnostic of abuse by shaking.

* * *

15. Even the defense's expert witness agreed that Alicia's injuries were consistent with child abuse. His only objection to the prosecution's theory of the case was grounded in the possibility that Alicia could have been injured up to a week prior to her death, rather than mere hours before it.

16. This testimony was at cross-purposes with that of [defendant], who testified that virtually no one else could have had the opportunity to harm Alicia before her death.

* * *

18. However, new expert reports containing evidence of a recent shift in the scientific community challenging the reliability of the triad as a diagnostic tool completely undermine the inculpatory evidence presented at trial. . . . There is now no credible evidence that shaking caused [Alicia's] death.

19. In the 15 years since [defendant's] trial, it has become generally understood in the scientific community that the "triad," once thought to be necessarily diagnostic of SBS, now has a wide array of alternative causes.

20. Biomechanical studies in the past decade and a half have indicated that the massive amount of force required for shaking to cause the "triad" would necessarily result in collateral injury to the neck or spinal cord. No such injuries were noted in Alicia's case.

The allegations set forth in Miller's motion and the four affidavits suggest that in 2003, a physician advocating an alternate explanation for the findings may have been precluded from testifying on *Daubert* grounds.[1] Miller points out that today, courts recognize compelling doubts concerning the scientific underpinnings of the AHT diagnosis. See *People v Ackley*, 497 Mich 381; 870 NW2d 858 (2015); Papetti, Kaneb & Herf, *Outside the Echo Chamber: A Response to the "Consensus Statement on Abusive Head Trauma in Infants and Young Children"*, 59 Santa Clara L Rev 299, 300 n 2 (2019); and Findley et al, *Shaken Baby Syndrome, Abusive Head Trauma, and Actual Innocence: Getting It Right*, 12 Hous J Health L & Policy 209 (2012).[2]

The trial court denied defendant's motion in a written opinion, reasoning as follows:

---

[1] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993). "MRE 702 incorporates the standards of reliability that the United States Supreme Court articulated in *Daubert*[.]" *Elher v Misra*, 499 Mich 11, 22; 878 NW2d 790 (2016).

[2] The Findley article discusses in detail, many of the conventional assumptions underlying medical opinions that a parent abused a child have proven fundamentally flawed. Recent scientific studies and careful reviews of older studies have called into question the reliability of certain findings, including subdural and retinal hemorrhages, in confirming child abuse.

Defendant claims that she is entitled to a new trial in the instant case because of newly discovered scientific evidence that now provides an "alternative diagnosis" of death by natural causes. However, the evidence in the case remains the same. The alternative diagnosis put forth by defendant's new experts is based upon the exact same medical and autopsy records relied upon by the trial experts presented by both the People and the defense. It is simply a different interpretation of those records.

Further, at trial, Defendant presented an alternative theory (or diagnosis) through her own expert. Dr. Ljubisa Dragovic testified on her behalf, thus satisfying the Supreme Court's requirement that effective trial counsel "prepare or show up for the battle sufficiently." [*Ackley*, 497 Mich 381]. Given Defendant's admission that she shook her child, the expert testimony presented was an appropriate response to the People's case. Defendant would argue that every case of child abuse resulting in injury to the head is suspect. This position is supported by a small number of defense experts, however abusive head trauma is generally accepted within the medical community. Further, there can be no dispute that there are persons in our community commit [sic] acts of child abuse resulting in serious injury or death. The evidence presented at trial was sufficient to convince a jury that Defendant was one of those persons and the Court of Appeals agreed. Neither her trial attorney, nor her appellate attorney were ineffective. At trial the People's scientific evidence was rebutted and it was further challenged on appeal. Finally, it should be noted that although Defendant claims that the "controversy" related to [SBS] is new, in another case before this Court the expert presented at an evidentiary hearing stated that he had testified in similar cases since 2000 and that there had been case reports and small articles on related issues for the past twenty or thirty years. If true, Defendant certainly could have raised this issue on direct appeal. Defendant has not demonstrated good cause for failing to raise this issue previously.

Further, in order to demonstrate actual prejudice as required [by] MCR 6.508(D), Defendant must show that but for the alleged error, she would have "had a reasonably likely chance of acquittal." As noted above, Defendant did have the advantage of having a qualified and respected expert testify to an alternative theory of how and when the child was injured. There was also significant other evidence presented at trial to support her conviction. The Court of Appeals noted that this was not a case that came down to a battle of the experts. . . . Given the Defendant's own admission of shaking her child, there remains no reasonably likely chance of acquittal regardless of the defense expert's theory.

We granted Miller's application for leave to appeal the trial court's ruling. *People v Miller*, unpublished order of the Court of Appeals, entered May 3, 2019 (Docket No. 346321).

III

Miller contends that at the very least, the trial court should have conducted an evidentiary hearing. She argues that scientific developments in the science relating to SBS/AHT combined

with new expert support for an alternative and natural cause of Alicia's death constitute newly discovered evidence undermining the reliability of the jury's verdict. Miller further asserts that the trial court did not fairly review the trial record and improperly relied on nonrecord information.

MCR 6.500 *et seq*., governs motions for relief from judgment. Under MCR 6.508(D)(3), a court may not grant relief if the motion alleges grounds "that could have been previously raised, unless the defendant demonstrates both good cause for failing to raise such grounds earlier as well as actual prejudice." *People v Johnson*, 502 Mich 541, 565; 918 NW2d 676 (2018). " 'Cause' for excusing procedural default is established by proving ineffective assistance of appellate counsel, pursuant to the standard set forth in *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984), or by showing that some external factor prevented counsel from previously raising the issue." *People v Reed*, 449 Mich 375, 378; 535 NW2d 496 (1995). Miller contends that good cause in the form of newly discovered evidence compels relief from judgment, and that the new evidence makes a different result probable on retrial.

A new trial may be granted on the basis of newly discovered evidence if a defendant shows that: "(1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial." *People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003) (quotation marks and citation omitted).

As a threshold matter, Miller's eligibility for relief from judgment hinges on whether she can establish that the evidence on which she relies qualifies as newly discovered, and good cause for failing to raise the possibility of a competing pneumonia diagnosis or for neglecting to challenge the scientific reliability of the SBS/AHT diagnosis in 2003. Without an evidentiary hearing, the trial court could not evaluate these questions in an informed manner.

Rather than entertaining testimony addressing the issues raised in Miller's motion and testing the facts contained in the affidavits supporting it, the trial court relied in part on facts *outside* the record. The court stated that in an unnamed "[]other case," an expert allegedly testified that there had been "case reports and small articles on related issues for the past twenty or thirty years" regarding the "controversy" related to SBS. "If true," the court continued, "Defendant certainly could have raised this issue on direct appeal." Evidence outside of the record should not have played any role in this case. "The only facts that the trial court should consider in deciding whether to grant a new trial are those in the newly discovered evidence and those in the record." *People v Grissom*, 492 Mich 296, 322; 821 NW2d 50 (2012). Further, the purpose of an evidentiary hearing is to examine whether Miller's allegations are "true." The trial court clearly erred by relying on testimony from another case to reject that the SBS/AHT controversy recognized in the caselaw constitutes new evidence in this case.

The trial court additionally erred by expressing—again without the benefit of evidence— that the position taken by Miller's experts "is supported by a small number of defense experts, however abusive head trauma is generally accepted within the medical community." This conclusion may or may not be accurate; the record contains nothing that would permit us to review

-6-

it, and it is firmly rebutted by Miller's affidavits.[3]  Similarly, whether the newly raised alternative cause of death—pneumonia—may be properly characterized as newly discovered requires fleshing out.[4]

We also take issue with the trial court's determination that because the "alternative diagnosis put forth by defendant's new experts is based upon the exact same medical and autopsy records relied upon by the trial experts," it does not qualify as "newly discovered."  The Supreme Court has instructed that "a defendant's awareness of the evidence at the time of trial precludes a finding that the evidence is newly discovered" thereby distinguishing "newly discovered" evidence from "newly available" evidence.  *People v Rao*, 491 Mich 271, 282-283; 815 NW2d 105 (2012).  However, changes in interpretations of medical and autopsy records derived from a shifting understanding of the underlying science require that we view the evidence through a different lens than the Court used in *Rao*.  The parties agree that the underlying physical evidence (the medical and autopsy records) remains the same.  The scientific understanding of those records has allegedly changed.  If the opinions espoused by Miller's experts gained acceptance only after her 2003 trial, that evidence potentially qualifies as newly discovered.  Absent an evidentiary hearing, the trial court was unable to construct a timeline of scientific consensus regarding SBS/AHT over the past 20 years.  A shift in scientific consensus undermining the evidence presented at trial would indeed constitute newly discovered evidence.[5]

---

[3] We review matters of constitutional and statutory interpretation de novo.  *People v Williams*, 326 Mich App 514, 518; 928 NW2d 319 (2018), rev'd in part on other grounds \_\_\_ Mich \_\_\_; 940 NW2d 75 (2020).  We review the trial court's decision on a motion for a new trial for an abuse of discretion and its findings of fact for clear error.  *People v Miller*, 482 Mich 540, 544; 759 NW2d 850 (2008).

[4] We note that the autopsy report authored by Dr. Hunter describes that upon sectioning, Alicia's lungs demonstrated "minimal edema and only mild congestion[.]"  Dr. Hunter found "no focal areas of consolidation or masses"; his microscopic findings were: "acute bronchopneumonia and congestion."  These findings seem to contrast with those of Miller's experts.  The role of Dr. Hunter's lung findings in the preparation of Miller's defense remains to be explored at the evidentiary hearing.

[5] MCR 6.502(G), which relates to the threshold requirement for filing successive motions for relief from judgment, supports this conclusion.  That rule provides in pertinent part and with emphasis added:

> (2) A defendant may file a second or subsequent motion based on a retroactive change in law that occurred after the first motion for relief from judgment or a claim of new evidence that was not discovered before the first such motion.  The clerk shall refer a successive motion that asserts that one of these exceptions is applicable to the judge to whom the case is assigned for a determination whether the motion is within one of the exceptions.

Miller presented compelling evidence of such a shift. In addition to the affidavits from medical experts referring to the developments in scientific understanding of SBS/AHT and the possibility of an alternative and natural cause of death, she also pointed to the fact that the National Association of Medical Examiners withdrew a position paper issued in 2001 endorsing the conclusions presented at her trial. We emphasize that Miller did not need to prove that the science was itself inherently unreliable; the issue is whether scientific understanding and knowledge postdating her trial call into question the reliability of the jury's verdict.

Moreover, because it did not hold an evidentiary hearing the trial court's decision that the newly discovered evidence could not have changed the trial's outcome cannot withstand scrutiny. In *Johnson*, 502 Mich at 566-567 (emphasis added), our Supreme Court held that "[i]n order to determine whether newly discovered evidence makes a different result probable on retrial, a *trial court must first determine whether the evidence is credible*." The *Johnson* Court explained:

> In making this assessment, the trial court should consider all relevant factors tending to either bolster or diminish the veracity of the witness's testimony. . . . *A trial court's function is limited when reviewing newly discovered evidence, as it is not the ultimate fact-finder; should a trial court grant a motion for relief from judgment, the case would be remanded for retrial, not dismissal. In other words, a trial court's credibility determination is concerned with whether a reasonable juror could find the testimony credible on retrial.* See *Connelly v United States*, 271 F2d 333, 335 (CA 8, 1959) ("The trial court has the right to determine the credibility of newly discovered evidence for which a new trial is asked, and if the court is satisfied that, on a new trial, *such testimony would not be worthy of belief by the jury*, the motion should be denied.") (quotation marks and citation omitted; emphasis added).

---

The court may waive the provisions of this rule if it concludes that there is a significant possibility that the defendant is innocent of the crime.

(3) For purposes of subrule (G)(2), *"new evidence" includes new scientific evidence*. This includes, but is not limited to, shifts in science entailing changes:

(a) in a field of scientific knowledge, *including shifts in scientific consensus*;

(b) in a testifying expert's own scientific knowledge and opinions; or

(c) in a scientific method on which the relevant scientific evidence at trial was based.

Although MCR 6.502(G)(3) facially relates only to *successive* motions, it naturally and logically follows that if shifts in scientific consensus constitute new evidence for successive motions for postjudgment relief, that necessarily requires that shifts in scientific consensus occurring after the time of the final judgment of conviction similarly satisfy the "new evidence" standard for a defendant's initial motion seeking postjudgment relief.

* * *

> If a witness's lack of credibility is such that *no* reasonable juror would consciously entertain a reasonable belief in the witness's veracity, then the trial court should deny a defendant's motion for relief from judgment. However, if a witness is not patently incredible, a trial court's credibility determination must bear in mind what a reasonable juror might make of the testimony, and not what the trial court itself might decide, were it the ultimate fact-finder. [*Johnson*, 502 Mich at 567-568 (first emphasis added).]

Here, the trial court exceeded its gatekeeping role by prematurely denying Miller's motion. At the very least, the affidavits supplied evidence necessitating an evidentiary hearing to ascertain the affiants' credibility. See MCR 6.508(B). The trial court was required to determine in the first instance only whether the newly discovered evidence was "patently incredible," and, if not, "what a reasonable juror might make of the testimony" at a retrial. See *Johnson*, 502 Mich at 568. In failing to make any initial credibility determination, the trial court improperly substituted itself as the ultimate fact-finder. See *id.* It is worth emphasizing that, during the course of defendant's trial, all of the experts agreed and the defense conceded that Alicia died as a result of abuse. If that conclusion is now suspect, defendant's conviction is similarly undermined.

We need not address Miller's alternative ineffective assistance of counsel argument at this juncture. Absent an informed evaluation concerning whether trial counsel could have reasonably challenged the prosecution's theory of SBS/AHT at the time of the trial, it is impossible to evaluate whether trial counsel performed deficiently by pursuing a defense theory embracing the SBS/AHT diagnosis. If necessary, we direct that the trial court may address this argument in light of the evidence presented at the evidentiary hearing.

IV

Finally, given the original trial judge's emphatically stated viewpoints, we conclude that this matter should be reassigned to a new trial judge on remand. In fairness to Miller, we do not believe that the trial judge could easily set aside her previously expressed views and findings. Accordingly, reassignment is advisable to avoid even the appearance of injustice. See *People v Walker*, 504 Mich 267, 285-286; 934 NW2d 727 (2019). As our Supreme Court once observed, even "the most upright man [or woman] might not be wholly objective" when asked to set aside his or her existing conceptions of a given case. See *People v Jackson*; 391 Mich 323, 341; 271 NW2d 22 (1974), overruled in part on other grounds by *McDougall v Schanz*, 461 Mich 15; 597 NW2d 148 (1999). See also *People v Pillar*, 233 Mich App 267, 271; 590 NW2d 622 (1998) ("Given the certainty and vigor with which the trial judge expressed her findings, . . . we are convinced that the judge would have difficulty setting side her previously expressed views and justly resolve the issue at a subsequent hearing.").

There are several reasons to believe reassignment appropriate. Although Michigan courts have recognized a "prominent controversy within the medical community regarding the reliability of SBS/AHT diagnoses," *Ackley*, 497 Mich at 391-392, the trial judge concluded otherwise by relying on her own personal knowledge and experience evidently developed in an unrelated case. Moreover, the trial judge mischaracterized the evidence presented at trial by repeatedly asserting

-9-

that Miller's limited admission that she shook the child *after* the child was already in physical distress constituted a confession of guilt. This amounted to a weighing of credibility that exceeded the trial judge's proper role. See *id.*

We reverse and remand for an evidentiary hearing and retain jurisdiction.

/s/ Michael F. Gadola
/s/ Elizabeth L. Gleicher
/s/ Cynthia Diane Stephens

# Court of Appeals, State of Michigan

## ORDER

People v Tonia Joyce Miller

Docket No. 346321

LC No. 2002-003157-FC

Michael F. Gadola
Presiding Judge

Elizabeth L. Gleicher

Cynthia Diane Stephens
Judges

Pursuant to the opinion issued concurrently with this order, this case is REMANDED for further proceedings consistent with the opinion of this Court. We retain jurisdiction.

Proceedings on remand in this matter shall commence within 56 days of the Clerk's certification of this order, and they shall be given priority on remand until they are concluded. As stated in the accompanying opinion, the matter must be assigned to a new judge and an evidentiary hearing conducted to determine if trial counsel was ineffective and whether "newly discovered" evidence warrants a new trial. The proceedings on remand are limited to these issues.

The parties shall promptly file with this Court a copy of all papers filed on remand. Within seven days after entry, appellant shall file with this Court copies of all orders entered on remand.

The transcript of all proceedings on remand shall be prepared and filed within 21 days after completion of the proceedings.

_____
Presiding Judge

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

August 6, 2020
Date

_____
Chief Clerk