*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

EDWARD LEE GREEN, JR.,

Defendant-Appellant.

UNPUBLISHED
January 27, 2022

No. 355619
St. Clair Circuit Court
LC No. 19-002542-FH

Before: SAWYER, P.J., and SERVITTO and RICK, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions for two counts of first-degree home invasion, MCL 750.110a(2). On appeal, defendant argues that he should be granted a retrial because 1) his trial was tainted by prosecutorial misconduct and 2) his trial counsel rendered ineffective assistance. Additionally, defendant, in a Standard 4 Brief, argues that there was insufficient evidence to support his convictions. We disagree and affirm.

## I. BACKGROUND

This appeal arises from two convictions of home invasion. The first conviction involved an alleged home invasion that occurred on July 22, 2019, at the home of George Mayer. Mayer stated that he was awoken that morning at around 4:30 a.m. when his dog started growling "as if she heard something outside," but he then went back to sleep.

St. Clair County Sherriff's Department Deputy Chris Roehl, received a call early the same morning concerning a suspicious car left running in someone's driveway. Upon arriving at the residence of the caller, Deputy Roehl discovered a silver Chrysler 300 belonging to defendant sitting in the driveway with the lights on, the driver's-side door open, and the engine running. No keys were inside the car and no one else was around. Deputy Roehl stated that the homeowner who called about the car did not know whose it was or how it got there.

In the back seat of defendant's car, Deputy Roehl found a black fanny pack containing Mayer's identification, credit cards, and checks. According to Mayer, he had left the fanny pack on the armrest of his couch in his living room—roughly an arm's-length away from his front

-1-

door—when he went to bed the night before. Mayer testified that he had closed and locked his door before he went to sleep. When Deputy Roehl arrived at Mayer's home to return the fanny pack later in the morning of July 22, 2019, it was also discovered that Mayer's screen door had been cut open at some point during the night before. Mayer testified that his screen was not cut when he went to bed on July 21, 2019.

Deputy Roehl also received a second call on the morning of July 22, 2019, regarding a suspicious person in the yard of Autumn LaCroix, whose home was across the street from defendant's abandoned vehicle. LaCroix testified that shortly after 5:00 a.m. that morning, after her boyfriend left for work, she was alerted by her home security system[1] of movement near her garage. Live security footage from outside of her house showed someone in the driveway looking through LaCroix's living room window. LaCroix then activated a loud alarm through the security system, at which point she saw the person outside run away from her home and across her front yard.

Defendant was eventually located later that morning by St. Clair County Sherriff's Department Deputy Gil Sanchez. Defendant was found walking alone on a nature trail and wearing all black, which Deputy Sanchez described as "a little bit out of the ordinary for people exercising or hiking on the trail". Deputy Roehl noted that the clothing was similar to the clothing worn by the suspicious person in LaCroix's security footage. When Deputy Sanchez asked defendant about the abandoned vehicle, defendant admitted it was his vehicle, but he stated that his brother had borrowed the car and defendant asserted he had been with his girlfriend the night before.

Defendant's second conviction also involved an alleged home invasion, this one occurring between August 2 and 3, 2019, at the home of Leigh Jewell. Jewell testified that, on the evening of August 2, 2019, she went to sleep at approximately 11:30 p.m., leaving her purse on the kitchen table overnight. The next morning, she discovered that the purse was missing. According to Jewell, the windows and doors were all closed when she went to bed, but the kitchen window near the purse was left unlocked and could be opened from outside. Jewell stated that the purse contained, among other valuables, a silver coin that once belonged to her grandfather. Jewell eventually filed a police report regarding the missing property.

St. Clair County Sherriff's Department Detective Chris Schwartzkopf was charge of investigating the case. He testified that he discovered that defendant pawned a coin matching the coin Jewell described, and Jewell confirmed that it was indeed the coin from her purse. With this information, defendant was arrested for both the July 2019 and August 2019 home invasions. After the arrest, Detective Schwartzkopf interviewed defendant regarding these incidents. During the interview, defendant stated that an unidentified man named Robert had instructed him to park in the driveway where his car was found on July 22, 2019, and that person left Mayer's fanny pack in the vehicle. Defendant stated that he did not know this individual, but that defendant offered to give him a ride from a nearby gas station in exchange for $20. According to defendant, this all

---

[1] LaCroix's home security system had two outdoor cameras, one by the front door and another on the garage, and the system alerted her phone when motion was detected outside.

occurred after he ended his shift at a restaurant at around 2:00 a.m. However, evidence at trial indicated that defendant's employment actually ended in early June 2019, well before this incident.

When asked about his connection to the August 2-3, 2019 home invasion, defendant stated that, on August 3, 2019, he agreed to drive a girl he just met that same day to the pawn shop. Defendant said the girl's name was Melody, but he did not know her last name, nor could he provide any additional identifying information. According to defendant, Melody was the one attempting to pawn Jewell's silver coin, and he only put his information down for the transaction because Melody did not have the required identification.

Detective Schwartzkopf also testified about a recorded jail phone call between defendant and his girlfriend that took place shortly after the interview, which was admitted at trial. During this call, defendant mentioned that he went to the pawn shop. Then they discussed how defendant was doing and what he expected was going to happen. Defendant repeatedly stated that "it is what it is," but stressed his view that the evidence in his case only established that he possessed stolen property, not home invasion.

A pawn shop employee also identified defendant as the person who pawned the silver coin. She was unsure whether anyone else accompanied him. Furthermore, trial testimony also established the locations of and relative distance between these events. Specifically, the location where defendant's vehicle was found and LaCroix's home was approximately 3 ½ miles from Mayer's home, Mayer's home was approximately 4 miles from Jewell's home, and the trail where defendant was found after the first home invasion was approximately 4 miles from defendant's abandoned car and LaCroix's home. The jury ultimately convicted defendant on both counts of home invasion.

## II. PROSECUTORIAL MISCONDUCT

Defendant first argues that his convictions should be reversed and he should be retried because the prosecutor engaged in misconduct by appealing to the sympathy of the jury and attempting to shift the burden of proof.[2] We disagree.

Claims of prosecutorial misconduct generally require showing that the defendant was denied a fair and impartial trial. *People v Solloway*, 316 Mich App 174, 201; 891 NW2d 255 (2016). Defendants are "entitled to a fair trial, not a perfect one," and this Court must review the alleged misconduct in context. *Id*. However, because defendant did not properly preserve his claims of prosecutorial misconduct, our review is limited to "plain error affecting the defendant's

---

[2] This Court stated in *People v Jackson*, 313 Mich App 409, 425 n 4; 884 NW2d 297 (2015):

> [A]lthough the term "prosecutorial misconduct" has become a term of art often used to describe any error committed by the prosecution, claims of inadvertent error by the prosecution are "better and more fairly presented as claims of 'prosecutorial error,' with only the most extreme cases rising to the level of "prosecutorial misconduct." [Cleaned up.]

For clarity and consistency's sake, and because it has become a term of art, we will utilize the term "prosecutorial misconduct."

substantial rights." *Id*. at 202. This requires a defendant to show prejudice, i.e., "that the error affected the outcome of the lower court proceedings." *Id*. In addition, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings." *People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018) (cleaned up).

A prosecutor may not appeal to the jury's sympathy for the victim. *People v Dobek*, 274 Mich App 58, 80; 732 NW2d 546 (2007). Furthermore, "[a] prosecutor may not imply in closing argument that the defendant must prove something or present a reasonable explanation for damaging evidence because such an argument tends to shift the burden of proof." *People v Fyda*, 288 Mich App 446, 463-464, 793 NW2d 712 (2010). For the same reason, a prosecutor also cannot comment on a defendant's failure to present evidence. *Id*. at 464. However, a prosecutor is permitted to argue that inculpatory evidence is undisputed by the defendant and that evidence is uncontested, even if the defendant is the only person capable of countering that evidence. *Id*.

Here, defendant asserts that the prosecutor impermissibly appealed to the jury's sympathy by repeatedly highlighting the sentimental value of the coin that defendant allegedly stole. Defendant emphasizes the following questioning between the prosecutor and Jewell, in particular:

> *Q*. And then there were things of sentimental value to you?
>
> *A*. My silver coin that I got from my grandmother when my grandfather passed away and one thing that my grandmother gave me two weeks before she died.
>
> &ast; &ast; &ast;
>
> *Q*. All right. So looking with me to [sic] Exhibit 10, tell me whose coin this was originally?
>
> *A*. It was my grandfather's.
>
> *Q*. Okay. And how did it come to you?
>
> *A*. After my grandfather passed away, I helped, I was helping my grandmother clean out his dresser drawers and that and we came across it and she gave it to me.
>
> *Q*. Okay. And do you know the significance of why your grandfather had it?
>
> *A*. My aunt and I are assuming that he had the coin set aside from his other silver because that was the year that he got out of World War II.
>
> &ast; &ast; &ast;
>
> *Q*. Okay. And so what year is the coin?

*A.* 1945.

*Q.* Okay. And can you describe it? What, like what kind of coin is it?

*A.* Walking Liberty, silver.

*Q.* So, it's a silver, is it a dollar, a silver dollar?

*A.* Nope, 50 cent piece. I'm sorry.

*Q.* Okay. And we call it walking Liberty because it has the Lady Liberty on the front side and the eagle on the rear; is that right?

*A.* Yes.

*Q.* Okay. And what does your boyfriend Ray do with coins?

*A.* Oh, he saves the silver too and polishes it up knowing that he's not supposed to, but we were sitting one night and I had him shine it up for me so I could give it to my son.

*Q.* Okay. So explain what your plans were for this coin.

*A.* To give it to my oldest son that met my grandfather when he was a small child.

*Q.* Okay. And when you say he polished it up even though you're not supposed to. What do you mean?

*A.* You polish silver you lose the value of the silver.

*Q.* Okay. But you, did you see him polish it?

*A.* Oh, yeah, I sat right there and watched him.

*Q.* Okay. And what, what does he use to polish coins?

*A.* Polishing cloth.

*Q.* Okay. And some kind of chemical or—

*A.* Something, I don't remember what it was.

*Q.* Okay. Like a silver polish?

*A.* Yes, a silver polish.

*Q.* Does that change the finish in some way?

*A.* Yes, it shines it.

*Q.* Okay.

*A.* Very shiny.

*Q.* And do you know why you're not supposed to, why it decreases the value?

*A.* I don't remember.

*Q.* Okay.

*A.* I don't, I just wanted it shiny.

*Q.* Okay. All right, so do you know for sure that this coin was in your purse on that day, August 2nd and 3rd?

*A.* Yes, I do.

\* \* \*

*Q.* Okay. And how did you get the coin back?

*A.* I had to pay $3 to get it back.

*Q.* So are you still able to pass it on to your son?

*A.* Yes.

*Q.* Okay. Did you get the sentimental object from your grandmother or any other contents of your purse back?

*A.* No.

According to defendant, the only evidentiary purpose for discussing the coin was to establish its unique qualities—primarily its uncharacteristic shine. Defendant asserts that, while the testimony relating to the coin's shine was appropriate for identification, the remaining testimony was unnecessary and merely designed to evoke sympathy for the victim.

We conclude that this testimony did not amount to an improper attempt by the prosecutor to evoke the jury's sympathy. While overly emphasizing the sentimentality of stolen property can in some instances constitute improper argument, here the prosecutor's explicit comments about the coin's sentimental value were limited and not a blatant appeal to jurors' sympathies. Compare *People v Watson*, 245 Mich App 572, 591-592; 629 NW2d 411 (2001) (isolated commentary that "[the defendant] did something to [the victim] that no one should do to any other human being" and that "[h]e treated her in a way that no animal should be treated" was not improper and "was not so inflammatory as to prejudice" the defendant), with *People v Dalessandro*, 165 Mich App 569, 581; 419 NW2d 609 (1988), (concluding that it was improper for the prosecutor to constantly

-6-

refer to "the poor innocent baby" because such statements "were obviously intended to elicit just that emotional response" and evoke jurors' sympathies).

Additionally, much of this allegedly faulty questioning, specifically that relating to the coin's shine, type, and year, was required to properly identify the coin and clearly not intended to evoke jurors' sympathies. Regardless of whether the more general questioning concerning the coin's background may have incidentally invited sympathy, we conclude that this was for the proper purpose of identifying the coin and Jewell's credibility on the matter.

Furthermore, this alleged misconduct did not prejudice defendant. The trial court below specifically instructed the jurors that "[y]ou must not let sympathy or prejudice influence your decision," and "jurors are presumed to follow their instructions." *People v Stevens*, 498 Mich 162, 177; 869 NW2d 233 (2015) (cleaned up). Thus, without some additional evidence showing that the jury was in fact influenced by sympathy for the victim, we cannot conclude that the prosecutor's questioning actually affected the outcome below. Additionally, Jewell's responses make clear that the coin was returned, undermining any contention that the questioning was even capable of eliciting the jury's sympathy. Under these circumstances, defendant was not prejudiced by the questioning, and reversal is thus unwarranted on the basis of this line of inquiry.

Defendant also claims that the prosecutor improperly attempted to shift the burden of proof in both questioning and closing arguments. Defendant specifically highlights the following exchange at trial between the prosecutor and Schwartzkopf regarding defendant's phone call with his girlfriend:

> *Q*. At any time during this recording talking to his girlfriend . . . does [defendant] tell her that he did not break into those houses?
>
> *A*. No.
>
> *Q*. Did he tell her that you have the wrong guy he did not commit the home invasions?
>
> *A*. No.

Defendant also notes the following statements by the prosecutor during closing arguments:

> And now the phone call. The phone call to the girlfriend. An hour after he finishes meeting with the detective he calls his girlfriend. What do people do when they are wrongfully accused? They say, boy, you have the wrong guy. I did not do this. This is a travesty. This is terrible. I was wrongfully accused, but he's relaxed. He's talking to his girlfriend that he trusts. Does he say that? Not one time. He says they locked my ass up. Wow, that would be a time to be upset about being wrongfully accused. They locked my ass up. Hey, it is what it is. Those things that went to the pawn shop I used my I.D. for, they came back on me. Hey, it is what it is. Not that stupid Melody girl I wished I'd never met her, but, hey, it is what it is. She says, how you doing? He says, I'm all right. Not I'm angry, I'm wrongfully accused, this is ridiculous, but does it make sense to cry over spilled milk? It is what it is. I got to deal with it.

* * *

> [L]isten not only to what he said when he lied to Deputy Sanchez, when he lied to the detective and the things that he admits basically to his girlfriend. Think about what he does not say. The Defendant traumatized a lot of people with these home invasions and what he does not say to the detective is I didn't do it. What he does not say to his girlfriend is I didn't do it. Why doesn't he say that? Because he did it.

Relying on *Fyda*, defendant argues that these questions and statements essentially placed a burden on defendant to affirmatively proclaim his innocence.

We disagree that these questions and comments effectively forced defendant to affirmatively proclaim his innocence or amounted to improper shifting the burden of proof.[3] Viewed in context, the prosecutor was not attempting to elicit a proclamation of innocence from defendant. Rather, the prosecutor highlighted, based on the evidence admitted at trial, defendant's failure to speak where a reasonable person would have done so. In the phone call, defendant asserted that the police only had evidence that he was in possession of stolen property, and that they did not have any evidence that he committed a home invasion. The prosecutor merely highlighted defendant's silence as additional evidence from which the jury could infer defendant's guilt, which was a reasonable inference to be made from the evidence. Therefore, the real issue here is not whether the prosecutor improperly shifted the burden of proof, but whether or not defendant's silence could actually be used as substantive evidence of guilt.

Under the Fifth Amendment to the United States Constitution, a defendant's "post-arrest, post-*Miranda*[4] silence" cannot be used as direct evidence of the defendant's guilt. *People v Shafier*, 483 Mich 205, 213-214; 768 NW2d 305 (2009); see US Const, Am V. However, it is permissible to use a defendant's silence as substantive evidence when these constitutional rights are not implicated. See *People v McReavy*, 436 Mich 197, 203; 462 NW2d 1 (1990) ("The admission for substantive purposes of evidence of the defendant's demeanor and statements made during custodial interrogation after a valid waiver of his Fifth Amendment privilege against compelled self-incrimination and prior to invoking the right to remain silent is neither error of constitutional dimension nor a violation of the Michigan Rules of Evidence."); *People v Rice (On Remand)*, 235 Mich App 429, 437; 597 NW2d 843 (1999) (concluding that the prosecutor did not engage in "improper commentary on constitutionally protected silence" when the prosecutor offered evidence regarding the defendant's nonverbal conduct and silence that occurred after the defendant waived his Fifth Amendment rights). Accordingly, the prosecutor did not engage in improper conduct by offering this evidence because defendant had waived his rights.

In the instant case, it is undisputed that defendant waived his Fifth Amendment right to silence when he voluntarily responded to questioning after being given *Miranda* warnings during

---

[3] We note that portions of the recorded interview and phone call were admitted into evidence and played for the jury during trial. Defendant does not argue that this evidence was inadmissible.

[4] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

-8-

the interview with Detective Schwartzkopf. Furthermore, even discounting defendant's waiver, his right to silence would not extend to the phone call with his girlfriend because he was not subject to custodial interrogation at the time. See *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966) (a defendant's *Miranda* rights are only implicated when he or she is subjected to a custodial interrogation, which means "questioning *initiated by law enforcement* officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way") (emphasis added); *People v Cheatham*, 453 Mich 1, 11; 551 NW2d 355 (1996) ("*Miranda* protects defendants against *governmental coercion* leading them to surrender rights protected by the Fifth Amendment; it goes no further than that.") (cleaned up; emphasis added).

Here, although he was in custody at the time, defendant's silence occurred after he waived his right to silence and during a conversation with his girlfriend—not under questioning from law enforcement officers. Applying the aforementioned legal principles to these facts, it was constitutionally proper for the prosecutor to rely on defendant's silence and lack of denials as substantive evidence of guilt. Therefore, no prosecutorial misconduct occurred.

Additionally, even assuming arguendo that these questions and comments did constitute an improper attempt to shift the burden of proof, there was no prejudice to defendant. As noted, jurors are presumed to follow their instructions. See *Stevens*, 498 Mich at 177. In this case, the trial court instructed the jury that defendant was entitled to the presumption of innocence, that the burden of proof was solely on the prosecutor, and that the lawyers' statements, questions to the witnesses, and arguments were not evidence. Therefore, defendant has not established that he is entitled to reversal.

## III.  INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant next argues that his convictions should be reversed and he be retried because his trial counsel rendered ineffective assistance. We disagree.

Whether a defendant was denied the effective assistance of counsel presents a mixed question of fact and constitutional law. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). Because defendant did not properly preserve his claim of ineffective assistance, our review is limited to the existing record. *People v Thomas*, 260 Mich App 450, 456; 678 NW2d 631 (2004).

To prove ineffective assistance of counsel, a defendant must show that "counsel's performance was deficient and that counsel's deficient performance prejudiced the defense." *Fyda*, 288 Mich App at 450. "A counsel's performance was deficient if it fell below an objective standard of professional reasonableness." *Id*. To establish prejudice, the defendant must show "it is reasonably probable that, but for counsel's error, the result of the proceeding would have been different." *Id.*

Defendant argues that his trial counsel's failure to object to the prosecutor's alleged misconduct deprived him of a fair trial and thus constituted ineffective assistance of counsel. Defendant stresses that there was no strategic purpose for defense counsel not to object to the numerous instances of alleged prosecutorial misconduct discussed earlier.

As discussed, no misconduct occurred that would have warranted an objection by defense counsel. "Failing to advance a meritless argument or raise a futile objection does not constitute

ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). However, even if the comments were improper, defendant has not overcome the strong presumption that counsel's decision to not object was a matter of trial strategy. See *Strickland v Washington*, 466 US 668, 689; 104 S Ct 2052; 80 L Ed 2d 674 (1984) ("[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.") (cleaned up).

Nonetheless, even assuming that trial counsel's performance was deficient, defendant has not established that he suffered prejudice as a result. As discussed, jurors are presumed to follow their instructions and the judge properly instructed the jury about both relying on sympathy for the victim and the prosecutor's burden of proof. Therefore, the prosecutor's alleged improper questions are presumptively not harmful. See *Stevens*, 498 Mich at 177; see also *People v Reed*, 449 Mich 375, 401; 535 NW2d 496 (1995) ("Given the well-established proposition that jurors are presumed to follow the law, an alleged misstatement of the law by the prosecutor is presumptively not harmful, since the trial judge instructed the jury properly."). Furthermore, defendant has also failed to establish a reasonable probability that, but for counsel's alleged errors, "the result of the proceeding would have been different." *Fyda*, 288 Mich App at 450. As discussed below, the remaining evidence, although largely circumstantial, was more than sufficient for the jury to find defendant guilty beyond a reasonable doubt. Therefore, defendant's claims of ineffective assistance of counsel must fail.

## IV. INSUFFICIENT EVIDENCE

Lastly, defendant argues that there was insufficient evidence to support his convictions of first-degree home invasion. We disagree.

"This Court reviews de novo challenges to the sufficiency of the evidence." *Solloway*, 316 Mich App 174 at 180. A reviewing court "must determine whether the evidence was sufficient to justify a rational trier of fact's conclusion that the evidence proved the essential elements of the crime beyond a reasonable doubt." *Id*. The evidence is viewed "in the light most favorable to the prosecution . . . ." *People v Blevins*, 314 Mich App 339, 357; 886 NW2d 456 (2016). "Circumstantial evidence and the reasonable inferences that arise from that evidence can constitute satisfactory proof of the elements of the crime." *Id*. Further, "[a]ll conflicts in the evidence must be resolved in favor of the prosecution." *Solloway*, 316 Mich App 174 at 180-181.

To support a conviction of first-degree home invasion, a prosecutor must establish the following elements beyond a reasonable doubt:

(1) the defendant either breaks and enters a dwelling or enters a dwelling without permission; (2) the defendant either intends when entering to commit a felony, larceny, or assault in the dwelling or at any time while entering, present in, or exiting the dwelling actually commits a felony, larceny, or assault; and (3) while the defendant is entering, present in, or exiting the dwelling, either (a) the defendant is armed with a dangerous weapon, or (b) another person is lawfully present in the dwelling. [*People v Bush*, 315 Mich App 237, 244; 890 NW2d 370 (2016); see also MCL 750.110a(2).]

Defendant argues that the record lacks any evidence placing him at either Mayer's or Jewell's homes during the alleged home invasions, thus negating the first element of home invasion. Defendant asserts that the evidence, at most, only shows that he was in possession of stolen property, but not that he was the individual who took the items from the victims' respective houses. We disagree.

Viewing the evidence in a light most favorable to the prosecution, a reasonable juror could find that each element of defendant's crimes were established beyond a reasonable doubt. First, it is undisputed that both Mayer and Jewell were present in their homes when the alleged home invasions and underlying thefts occurred. Moreover, both individuals were also missing property that was taken from inside their homes, with Mayer's screen door actually cut open for access and Jewell's purse sitting near a closed but unlocked window. Although no witnesses definitively placed defendant at the scene of the two home invasions, sufficient circumstantial evidence existed for jurors to infer this fact.

Critically, the two home invasions occurred in the same general area approximately 4 miles apart, and defendant was discovered walking a trail near the location of the first home invasion later that morning. Defendant's car was also discovered, with Mayer's stolen property inside, across the street from where a suspicious person matching defendant's description was seen casing houses. Additionally, evidence established that defendant was the individual who pawned Jewell's stolen coin at the pawn shop. Furthermore, defendant's purported explanations for these circumstances were inconsistent to say the least. Defendant initially told officers that his brother was using his car at the time of the first alleged home invasion. However, when he was later questioned by a detective, he changed his story and placed blame on an unknown individual named Robert. Similarly, defendant alleged that he was only on record for pawning Jewell's coin because the actual thief, "Melody," lacked proper identification. But there is no evidence that this person even existed apart from defendant's statements, and he could not provide a last name or any identifying information. Finally, defendant claimed he had been working late at a local restaurant on the evening of the first home invasion, but the record reveals that defendant's employment at this restaurant had stopped well before this incident. Accordingly, a reasonable juror could have reasonably rejected defendant's inconsistent and vague explanations.

From this evidence, it was reasonable for jurors to infer that defendant was responsible for breaking and entering and stealing from both Mayer's and Jewell's homes. Therefore, we conclude that there was sufficient evidence to "justify a rational trier of fact's conclusion that the evidence proved the essential elements of the crime beyond a reasonable doubt." *Solloway*, 316 Mich App 174 at 180.

Affirmed.

/s/ David H. Sawyer
/s/ Deborah A. Servitto
/s/ Michelle M. Rick

-11-